692 A.2d 5

The ANCHOR PACKING COMPANY, et al.

v.

John GRIMSHAW, et al.

No. 1519, Sept. Term, 1996.

Court of Special Appeals of Maryland.

April 3, 1997.

Steven J. Parrott (Nancy Leibowitz and Hartman and Parrott, on the brief for appellant, Anchor Packing Co.), Annapolis, John P. Sweeney (Gregory Lockwood, Cheryl Z. Lardieri and Miles & Stockbridge, on the brief for appellant, Owens Corning), Baltimore, Gardner M. Duvall (Dwight W. Stone, II, Padriac McSherry Morton and Whiteford, Taylor & Preston, L.L.P., on the brief for appellant, Porter Hayden), Baltimore, (Robert J. Lynott, Peter W. Taliaferro, Thomas C. Swiss and Thomas & Libowitz, P.A., on the brief for appellant, Hopeman Brothers), Baltimore, for appellants.

William G. Burgy (Peter T. Nicholl, Patrick S. Guilfoyle, on the brief for appellee, Grimshaw), Baltimore, Thomas P. Kelly (Edward J. Lilly and Law Offices of Peter G. Angelos, on the brief for appellees, Zumas and McCafferty), Baltimore, (David

M. Layton and Ashcraft & Gerel, Baltimore, John Herrick, Theodore H.Huge and Ness, Motley, Loadholt, Richardson & Poole, Charleston, SC, on the brief for appellee, Granski), (Edward F. Houff, R. Thomas Radcliffe, Jr., Church & Houff, P.A., Baltimore, J. Ric Gass, Brian Trexell and Kravit, Gass & Weber, Milwaukee, WI, on the brief for appellee, Westinghouse Electric Corp.), for appellees.

Argued before MOYLAN and DAVIS, JJ., and THEODORE G. BLOOM (retired), specially assigned.

DAVIS, Judge.

This appeal involves four of the five mesothelioma cases consolidated for trial before the Circuit Court for Baltimore City under the caption *Casimir Balonis, et al. v. ACandS, et al.*, Case No. 9526101. Nick Zumas, Patrick McCaffery, John Grimshaw, and Ethel Granski[1] all filed suits in the circuit court against numerous defendants, alleging that he or she contracted asbestos-related mesothelioma from either workplace or household exposure to defendants' products. Trial began on September 21, 1995, and the jury returned verdicts on December 21, 1995.

In *Grimshaw*, the jury returned verdicts in favor of Barbara Bullinger, personal representative of the estate, against Owens–Corning, f/k/a Owens–Corning Fiberglas Corporation (OC), Porter Hayden Company (Porter Hayden), and Anchor Packing Company (Anchor) in the amount of $1,100,000. Verdicts were also returned in favor of those defendants against cross-defendants Owens–Illinois, Inc. (O–I), Foster–Wheeler Corporation (Foster–Wheeler), Armstrong World Industries, Inc. (AWI), GAF Corporation (GAF), ACMC, Inc., ACandS, Inc. (ACandS), Hopeman Brothers, Inc. (Hopeman), Pitts-

---

1. After filing their complaints, Zumas and McCaffery died. Their wives and personal representatives, Ann Zumas and Elizabeth McCaffery, continued the suits as survival actions and also brought actions in their individual capacity for wrongful death. Grimshaw also died prior to trial and his action was continued by the personal representative of his estate without a wrongful death claim. Granski was alive at the time of trial.

burgh Corning Corporation (PCC), and Rapid–American Corporation (Rapid). The jury also returned a verdict in favor of OC against third-party defendant Westinghouse Electric Corporation (Westinghouse).

In *Granski,* the jury returned verdicts in favor of Ethel Granski against OC in the amount of $2,210,531, plus $1,000,-000 for loss of consortium. The jury also returned verdicts against cross-defendants O–I, Porter Hayden, Rapid, and PCC.

In *McCaffery,* the jury returned a verdict in Elizabeth McCaffery's favor, as personal representative of the estate, against OC in the amount of $3,137,943 in compensatory damages. The jury also awarded Ms. McCaffery $1,000,000 for her loss of consortium claim and $2,300,000 in her wrongful death action. The jury returned verdicts against cross-defendants ACandS, Foster-Wheeler, PCC, Porter Hayden, Rapid, and Westinghouse.

In *Zumas,* the jury returned a verdict in favor of Ann Zumas, as personal representative of the estate, against OC in the amount of $2,523,189 in compensatory damages. The jury also awarded Ms. Zumas $1,000,000 for her loss of consortium claim and $1,200,000 for her wrongful death action. In addition, the jury returned verdicts against cross-defendants Hopeman, AWI, ACandS, PCC, GAF, O–I, Rapid, and Westinghouse.

The trial court entered final judgments in *Granski* and *Zumas* on March 11, 1996, in *Grimshaw* on April 16, 1996, and in *McCaffery* on April 17, 1996. The final judgments reflect the effects of settlements by joint tort-feasors and by the Manville Personal Injury Settlement Trust (Trust). Anchor, OC, Porter Hayden, Hopeman, and Westinghouse all noted timely appeals.

Three questions, presented for our review by appellants Anchor, OC, and Porter Hayden, pertain to all four cases on appeal. We restate them as follows:

I. Does the statutory cap on noneconomic damages established by MD.CODE (1974, 1995 REPL.VOL.), § 11–108 OF

THE COURTS & JUDICIAL PROCEEDINGS ARTICLE (C.J.) apply to plaintiffs' claims for wrongful death, loss of consortium, and personal injury damages resulting from exposure to asbestos?

II. Did the trial court err in refusing to produce confidential settlement agreements?

III. Did the trial court err by not reducing the final judgments in consideration of a federal order controlling the settlement of a third-party trust?

The following questions, which we have restated, presented by Anchor, OC, and Porter Hayden, are common to all defendants in *Grimshaw:*

IV. Did the trial court err when it denied a motion for *remittitur* or a new trial to conform the judgment to the amount of stipulated damages?

V. Did the court err when it issued its final judgment declaring that third-party Westinghouse was an adjudicated joint tort-feasor, but its liability was not subject to adjudication?

The next question is presented by Porter Hayden in *Grimshaw.* We restate it below:

VI. Should the trial court have reduced the judgment based on the pro rata release of a third party against whom default had been entered?

Two questions, presented by Anchor in *Grimshaw,* are restated by us as follows:

VII. Did the trial court err in submitting the issue of Anchor's liability to the jury based on its finding that plaintiff produced sufficient evidence from which a jury could reasonably conclude that Anchor's asbestos-containing products were a substantial factor in the development of plaintiff's mesothelioma?

VIII. Did the trial court err in submitting the issue of Anchor's liability to the jury based on its finding that plaintiff produced sufficient evidence to establish that An-

chor knew or should have known that the gasket or packing products it sold were defective or unreasonably dangerous?

The following questions presented by OC are restated below:

IX. Did the trial court err in refusing to grant OC's motion for judgment in *Granski?*

X. Did the trial court err in denying OC's motion for judgment in *Zumas,* or in the alternative, in granting plaintiffs' motion for judgment notwithstanding the verdict in *Zumas?*

The following question is presented by Hopeman in *Zumas:*

XI. Did the trial court properly deny Hopeman's motion for judgment and motion for judgment notwithstanding the verdict based on its finding that OC established legally sufficient evidence to support a jury finding that Hopeman's use of asbestos-containing products was a substantial factor in causing Zumas's mesothelioma?

## FACTS

### I. *JOHN GRIMSHAW*

John Grimshaw was born on November 16, 1916. Grimshaw married Edith Adelle on June 10, 1949, and the two were married for forty-nine years until her death on August 26, 1988. The Grimshaws had two daughters, Barbara Bullinger and Joanne Strickline, three grandchildren, and one great-granddaughter.

Grimshaw worked at Bethlehem Steel's Sparrows Point Shipyard (Shipyard) from 1940 to 1947 and from 1951 to 1979. During his career, Grimshaw worked as a machinist and a ratesetter. While at the Shipyard, Grimshaw was exposed to asbestos-containing products. Grimshaw began to feel ill in early June 1994, and he was diagnosed with mesothelioma later that month. Grimshaw died in January 1995. His *de bene esse* deposition was taken in October 1994, and the video-taped deposition was utilized at trial.

## II. *ETHEL GRANSKI*

Ethel Granski was born on August 23, 1948. From 1953 to 1963, Gene Abrams, Ethel Granski's stepfather, was either living with or married to Granski's mother, Rose Abrams. During this period of ten years, Abrams worked at various places, including Newport News Shipbuilding and Drydock, as an insulator, where, he claims, he was exposed to asbestos-containing products. When Granski was eight or nine, she began washing Abrams's work clothes, which allegedly were covered in asbestos dust when carried into their home. Granski became ill as a result of asbestos exposure and was diagnosed with mesothelioma in August 1993. Granski was still living at the time of trial.

## III. *PATRICK McCAFFERY, SR.*

McCaffery was born on March 6, 1939; in 1959 he married Elizabeth. From 1968 to 1970, McCaffery was a sheet metal worker at the Shipyard. During the course of his employment at the Shipyard, he was exposed to asbestos-containing products. McCaffery began feeling ill in November or December 1993 and was diagnosed with mesothelioma in January 1994. McCaffery died from mesothelioma on June 15, 1995, at the age of 56.

## IV. *NICK ZUMAS*

Zumas was born on October 14, 1925. In 1957 he married Anna Marie, from whom he was divorced in 1970. He remarried in 1982. From 1955 to 1987, Zumas worked as a machinist and millwright at the Shipyard. During the course of his employment, Zumas was exposed to products containing asbestos. Zumas began feeling ill in October 1993 and was diagnosed with mesothelioma in July 1994. He committed suicide at the age of 69, on May 7, 1995. Zumas's deposition testimony was presented at trial.

These facts will be supplemented throughout this opinion as needed.

# I

## APPLICATION OF THE STATUTORY CAP ON NONECONOMIC DAMAGES

The jury awarded damages to plaintiffs for personal injury, loss of consortium, and wrongful death. The Grimshaw estate was awarded noneconomic damages of $1,000,000. Ms. Granski was awarded noneconomic damages of $2,000,000 plus $1,000,000 for loss of consortium. The McCaffery estate was awarded noneconomic damages of $3,000,000, and Ms. McCaffery was awarded $1,000,000 for loss of consortium and $2,000,000 in noneconomic wrongful death damages. The Zumas estate was awarded $2,500,000 in noneconomic damages, the loss of consortium damages were $1,000,000, and Mrs. Zumas was awarded noneconomic wrongful death damages of $1,000,000. Following the jury's verdict, appellants filed motions to reduce the jury's awards by applying the statutory cap on noneconomic damages set forth in C.J. § 11–108. The trial court denied the motions without stating any reasons or issuing a written opinion. Appellants argue that the trial court erred when it failed to apply the statutory cap on noneconomic damages to the claims for damages asserted in the instant cases.

### A. WRONGFUL DEATH CLAIMS

Appellants [2] assert that the trial court erred when it failed to limit plaintiffs Zumas's and McCaffery's noneconomic recovery for wrongful death to $500,000, in accordance with the statutory cap set forth in C.J. § 11–108. Because both Zumas and McCaffery died after the effective date of the statute, appellants contend that the cap is applicable. Appellees, on the other hand, assert that the statute does not apply to asbestos-related cases, and in the alternative, that their cause of action for wrongful death arose prior to the October 1, 1994 effective date.

---

2. Appellants for purposes of questions I—III are Anchor, OC, and Porter Hayden.

 As a preliminary matter, we first must determine whether the damages cap for wrongful death actions provided in C.J. § 11–108 applies to wrongful death actions resulting from asbestos-related injuries and from non-medical malpractice injuries. In construing any statute, one looks first to the words used by the legislature and, if they are clear and unambiguous, gives those words their commonly understood meanings. *Oaks v. Connors,* 339 Md. 24, 35, 660 A.2d 423 (1995). The legislature stated plainly and unambiguously in C.J. § 11–108(b)(2)(i) that *"in any action* for damages for personal injury or wrongful death in which the cause of action arises on or after October 1, 1994, an award for noneconomic damages may not exceed $500,000." [3] (Emphasis added).

In addition, the legislative history of C.J. § 11–108 indicates that the General Assembly intended that the cap apply broadly, as opposed to only malpractice claims. In January 1986, Senate Bill No. 558 was introduced "for the purpose of imposing a certain limit on noneconomic losses in any action for personal injury." *See United States v. Streidel,* 329 Md. 533, 547, 620 A.2d 905 (1993). The legislature intended the statutory limitation to promote the availability and affordability of liability insurance in response to a legislatively perceived insurance crisis caused in part by excessive noneconomic damage awards in personal injury cases. *Oaks,* 339 Md. at 35, 660 A.2d 423. The bill was referred to the Senate Committee on Judicial Proceedings. *See Streidel,* 329 Md. at 547, 620 A.2d 905. The changes made by the Committee narrowed the type of actions subject to the cap to medical malpractice actions. *See id.* The House, however, refused to agree with the Senate's changes and referred the bill to a conference committee. *See id.* at 548, 620 A.2d 905. In the final version of the bill, the scope of the cap's application was to personal

---

**3.** An exception to this general rule is provided in § 11–108(b)(3)(ii). This section provides that, when "there are two or more claimants or beneficiaries, an award for noneconomic damages may not exceed 150% of the limitation established under paragraph (2) of this subsection, regardless of the number of claimants or beneficiaries who share in the award."

injury claims, including injuries other than those caused by medical malpractice. *See id.* at 549, 620 A.2d 905; *see also Potomac Electric Power Co. v. Smith,* 79 Md.App. 591, 622, 558 A.2d 768 (1989), *overruled on other grounds by United States v. Streidel,* 329 Md. 533, 620 A.2d 905 (1993) (the scope of the cap as finally approved was broadened from medical malpractice claims to any action for personal injury). Moreover, the primary purposes in enacting the noneconomic damages cap were to alleviate the liability insurance crisis and to decrease unpredictable and speculative noneconomic damages awards. *See id.*

Appellees argue that according to *Owens–Illinois, Inc. v. Armstrong,* 326 Md. 107, 604 A.2d 47 (1992) (hereinafter *Armstrong II),* the cap on noneconomic damages does not apply to the claim of an individual with asbestosis because of the latent nature of the disease. The Court, in *Armstrong II,* concluded that C.J. § 11–108 was not applicable in that case because the plaintiff's injury occurred prior to the July 1, 1986 effective date. *Id.* at 124, 604 A.2d 47. The Court did not conclude that the cap was inapplicable to all asbestos-related cases due to the latency of the disease, as appellees contend. Instead, the Court determined that the cap did not apply under the particular facts and circumstances of the case. *See id.* at 122–124, 604 A.2d 47.

First, the Court, in *Armstrong II,* distinguished between the time that a cause of action *arises,* for purposes of the statutory cap, and the time when a cause of action *accrues.*[4] *Id.* at 120–21, 604 A.2d 47. The Court held that the plaintiff's "noneconomic damages should be reduced under Section 11–108 ... only if his 'injury' came into existence on or after July 1, 1986." *Id.* at 122, 604 A.2d 47. Based on the evidence, the Court concluded that plaintiff's asbestos-related injury came into existence prior to the effective date of the statute, and therefore the award was not controlled by the cap on noneconomic damages. *Id.* at 124, 604 A.2d 47.

---

**4.** This distinction is discussed under Question I, Part B.

Thus, the Court's holding in *Armstrong II* is not in conflict with the statutory interpretation of C.J. § 11–108 that requires the cap on noneconomic damages to apply to wrongful death claims resulting from any cause of action arising on or after October 1, 1994, including asbestos-related claims. Moreover, the legislative purposes discussed *supra* justify applying the statutory cap to wrongful death claims arising from not only medical malpractice, but also to claims arising from asbestos-related diseases.

Appellants, however, note that in *Cole v. Sullivan,* 110 Md.App. 79, 676 A.2d 85 (1996), we held that C.J. § 11–108 does not apply to awards stemming from the commission of intentional torts. Looking beyond the usual meaning of the words of the statute and to the objective and purpose of the enactment, we concluded in *Cole* that the purpose of C.J. § 11–108 was to stabilize the spiraling cost of liability insurance and there is "no legislative intent to protect individuals from the economic consequences of intentional misconduct." *Id.* at 94, 676 A.2d 85. We also considered the fact that liability insurance does not generally cover intentional injuries. *Id.*

To the contrary, the instant case does not involve intentional misconduct on the part of appellants, and unlike *Cole,* reaches issues that the legislature intended to address with the noneconomic damages cap. Appellees, however, state that the intent of the legislature is not achieved by limiting the amount of awards of widows of asbestos-related disease victims because of the latent characteristics of the injuries. As explored *supra,* the legislative history of C.J. § 11–108 indicates that one of the purposes of the statute and amendments was to decrease the number of unpredictable awards in any cause of action for wrongful death. We conclude that the cap on wrongful death damages provided by C.J. § 11–108(b)(2)(i) applies to wrongful death actions arising from asbestos-related diseases.

Having determined that the statutory cap on noneconomic damages applies to wrongful death cases, we now must

determine whether it applies to this particular case or whether the "cause of action [arose] on or after October 1, 1994." C.J. § 11–108(b)(2)(i). Statutes that change a monetary limitation of recovery for personal injury are prospectively applied. *Wittel v. Baker*, 10 Md.App. 531, 541, 272 A.2d 57 (1970). In *Armstrong II*, the Court stated that "a cause of action *arises* when it first comes into existence," i.e. when all the elements of the claim are satisfied. *Armstrong II*, 326 Md. at 121, 604 A.2d 47.

A wrongful death action arises not from the injury or commission of the tort, but from the death of the injured party. *Globe American Casualty v. Chung*, 76 Md.App. 524, 535, 547 A.2d 654 (1988). "No action for wrongful death can be maintained until death has occurred; a person or vessel is liable for damages when *death* ensues from the tort." *Wittel v. Baker*, 10 Md.App. at 542, 272 A.2d 57 (amendment broadening the measure of damages in a wrongful death action was not applicable to plaintiff's claim, because the death occurred prior to the effective date of the amendment); *see also Harlow v. Schrott*, 16 Md.App. 31, 42, 294 A.2d 349 (1972). In an action for wrongful death, "the injury for which a plaintiff may recover is not that suffered by the decedent, but it is the loss that the plaintiff has suffered from the death of a spouse, child, or parent." *Lopez v. State Highway Admin.*, 327 Md. 486, 490, 610 A.2d 778 (1992). Thus, damages recoverable for wrongful death include damages from pecuniary loss, "mental anguish, emotional pain and suffering, loss of society, companionship, comfort, protection, marital care, parental care, filial care, attention, advice, counsel, training, guidance, or education. . . ." *See* C.J. § 3–904(d); *Lopez*, 327 Md. at 492, 610 A.2d 778.

Appellees rely on *Oxtoby v. McGowan*, 294 Md. 83, 447 A.2d 860 (1982) to support their assertion that the statutory cap should not be applied to the wrongful death claims in the instant case. The issue presented to the Court in *Oxtoby* was whether the Health Care Malpractice Claims Act, which requires arbitration before resorting to a court of law for final

determination, was applicable to the causes of action. *Id.* at 86, 447 A.2d 860. The effective date clause provided that the Act "shall take effect July 1, 1976, and shall apply only to medical injuries occurring on or after that date." *Id.* at 85, 447 A.2d 860. The plaintiff suffered the harm and the personal injury action arose prior to July 1, 1976. *Id.* at 97, 447 A.2d 860. Some of the monetary compensation sought by the plaintiff's estate, however, was suffered after July 1, 1976. *Id.* The Court held that a "medical injury" occurs, within the meaning of the effective date clause, even though all of the resulting damage to the patient has not been suffered. *Id.*

The *Oxtoby* Court then separately addressed the wrongful death claims and considered whether to split these claims from the court suit. *Id.* If the wrongful death claims were separated from the personal injury action, they would undergo arbitration and potentially return to court at a later time. *Id.* at 98, 447 A.2d 860. The Court concluded that "[i]n cases like that at hand, both the plaintiffs and the defendant would have to endure the expense of concurrently litigating common questions in two different forums. Such a result violates one of the principle purposes of the Act" to reduce the costs of handling medical malpractice claims. *Id.* The Court continued, *"For the limited purpose* of applying the effective date clause of the Act, we hold that where a medical injury has occurred to the patient prior to July 1, 1976, wrongful death actions based on the patient's death as a result of that medical injury are not subject to the Act, regardless of when death occurs." *Id.* at 99, 447 A.2d 860 (emphasis added). The holding of *Oxtoby,* therefore, was based on the particular facts of the case and intended to effectuate the purpose of the Arbitration Act.

The instant case does not present the same policy concerns associated with duplicative proceedings that was present in *Oxtoby.* In the case at bar, the wives of Zumas and McCaffery brought actions in their individual capacity for wrongful death. McCaffery died on June 15, 1995 and Zumas died on May 7, 1995. Each wrongful death action arose when the plaintiff's spouse died, which was after October 1, 1994, the

effective date of the statutory cap. Therefore, the statutory cap on noneconomic damages for wrongful death is applicable, and the trial court should have reduced the jury award for wrongful death to conform to the statutory cap.

## B. LOSS OF CONSORTIUM AND OTHER PERSONAL INJURY DAMAGES

Ms. Zumas, Ms. McCaffery, and Mr. Granski, spouses of injured plaintiffs, all filed loss of consortium claims in addition to the claims filed by their spouses for personal injury. Appellant s argue that the claims for personal injury and loss of consortium arose after July 1, 1986 but before October 1, 1994, and therefore, the $350,000 statutory cap set forth in C.J. § 11–108(b)(1) is applicable. Section 11–108(b)(1) provides that "[i]n any action for damages for personal injury in which the cause of action arises on or after July 1, 1986, an award for noneconomic damages may not exceed $350,000."

Application of the statutory cap is triggered when "the cause of action arises." *Armstrong II*, 326 Md. at 121, 604 A.2d 47. In *Armstrong II*, the Court held that a "cause of action arises" under the statutory cap set forth in C.J. § 11–108(b) when it first comes into existence, as distinguished from when a cause of action accrues. *Id.* at 121, 604 A.2d 47. A cause of action accrues when a plaintiff ascertains or should have ascertained "the nature and cause of his injury."*Id.* (citing *Harig v. Johns–Manville Products Corp.*, 284 Md. 70, 83, 394 A.2d 299 (1978)); *see also Fetzer v. Wood*, 211 Ill. App.3d 70, 155 Ill.Dec. 626, 569 N.E.2d 1237, 1243 (1991) ("Logic dictates that a plaintiff cannot bring a cause of action until he knows or reasonably should know of his injury, and also knows or reasonably should know that the injury was caused by the wrongful acts of another. However, that does not mean that the plaintiff does not have an existing cause of action of which he is unaware."). A cause of action arises in a negligence or strict liability case "when facts exist to support each element." *Id.* at 121, 604 A.2d 47. In a negligence case the injury would be the last element to come into existence.

*Id.* Therefore, in the instant case, as in *Armstrong II,* appellees' noneconomic injuries award should be reduced under § 11–108 only if their "injuries" came into existence on or after July 1, 1986. *Id.* at 122, 604 A.2d 47.

It is clear from the Court's opinion in *Armstrong II* that a cause of action arises before the asbestos-related disease is diagnosed. "[I]identifying the time at which an asbestos-related injury came into existence is usually not a simple task ... [d]ue to the latent nature of asbestos-related disease, experts and courts alike have had difficulty in pinpointing its onset." *Armstrong,* 326 Md. at 122, 604 A.2d 47. Based on the facts of the case, the Court, in *Armstrong II,* however, was not required to determine precisely when the asbestos-related injury came into existence. Armstrong was exposed to asbestos between 1943 and 1963, and an expert testified that asbestosis took between fifteen and twenty years to develop. *Id.* at 124, 604 A.2d 47. Viewing the facts in the light most favorable to appellant, Owens–Illinois, the Court assumed that the initial damage occurred in 1963 and the latency period before developing asbestosis was twenty years. *Id.* Based on these facts, Armstrong's disease would have developed by 1983, prior to the July 1, 1986 effective date. *Id.*

Appellees contend that the last element of a negligence action, the injury, arises in an asbestos-related disease claim when an individual is first exposed to asbestos fibers causing cellular changes to begin. In *Verbryke v. Owens–Corning Fiberglas Corp.,* 84 Ohio App.3d 388, 616 N.E.2d 1162 (1992), the Court of Appeals of Ohio concluded, as appellees ask us to do, that pleural plaque or pleural thickening, an alteration to the lining of the lungs, satisfies the injury requirements of §§ 388 and 402A of the RESTATEMENT (SECOND) OF TORTS. The Ohio court concluded that impairment to the body, such as cellular changes caused from exposure to asbestos fibers, is an alteration to the structure of the body even if no other harm is caused. *Id.* at 395, 616 N.E.2d 1162 (citing Restatement (Second) of Torts §§ 7 and 15).

In Maryland, however, "[t]o state a cause of action in negligence, a plaintiff must allege that the defendant had a duty of care which he breached, and that the breach proximately caused legally cognizable injury." *Faya v. Almaraz,* 329 Md. 435, 448, 620 A.2d 327 (1993) (citing *Pennwalt Corp. v. Nasios,* 314 Md. 433, 453, 550 A.2d 1155 (1988)). Similarly, in *DiLeo v. Nugent,* 88 Md.App. 59, 77, 592 A.2d 1126 (1991), *cert. granted,* 325 Md. 18, 599 A.2d 90 (1991), *dismissed,* 327 Md. 627, 612 A.2d 257 (1992), we determined when a cause of action arose under the statutory cap, § 11–108, in a medical malpractice action. In *DiLeo,* we relied on the decision of the Court of Appeals in *Hill v. Fitzgerald,* 304 Md. 689, 501 A.2d 27 (1985), which determined that a medical malpractice cause of action arises under C.J. § 11–108 when a negligent act, coupled with the resulting harm, amounts to a legally cognizable wrong. *DiLeo,* 88 Md.App. at 77, 592 A.2d 1126 (citing *Hill,* 304 Md. at 696, 501 A.2d 27). We concluded in *DiLeo* that plaintiff's cause of action arose on the date of the first negligent drug session instituted by her doctor. *Id.; see also Muenstermann v. U.S.,* 787 F.Supp. 499, 528 (D.Md.1992) (applying *Armstrong II,* in construing the applicability of the noneconomic damages cap, the court held that plaintiff's cause of action arose upon misdiagnosis and mismanagement of his labor).

Asbestos-related disease cases, however, differ from cases in which the injury and harm result simultaneously. Mere exposure to asbestos fibers does not always result in asbestos-related disease even when the individual's body undergoes cellular changes. In *Owens–Illinois v. Armstrong,* 87 Md. App. 699, 734, 591 A.2d 544 (1991), *aff'd in part and rev'd in part,* 326 Md. 107, 604 A.2d 47 (1992) (hereinafter *Armstrong I* ), we held, "To have a cause of action based on claims of product liability or negligence law submitted to the jury, the plaintiff must produce evidence of a legally compensable injury." *Id.* at 734, 591 A.2d 544 (citing *Wright v. Eagle–Picher Industries,* 80 Md.App. 606, 615, 565 A.2d 377 (1989)). The plaintiffs in *Armstrong I* contended that the trial court erred when it instructed the jury that damages could not be award-

ed solely for the medical condition of pleural plaques or pleural thickening. *Id.* at 735, 591 A.2d 544. "Pleural plaques and thickening result from the scarring of the pleura, the thin membrane that keeps the lungs contained and configured to the chest wall and diaphragm." *Id.* at 733, 591 A.2d 544. Medical experts agreed that pleural thickening and plaques are an alteration of an otherwise healthy pleura, but do not constitute any loss or detriment. *Id.* In addition, the medical experts testified that pleural plaques do not cause any pain and have no health significance. *Id.* Based on this evidence, the court instructed the jury, "If you find that a plaintiff has only pleural plaques and/or pleural thickening and not asbes-. tosis, then your answer to question one [on the verdict sheet] should be no as to that plaintiff. No damages may be awarded solely because of the pleural plaques or pleural thickening." *Id.*

 Plaintiffs in *Armstrong I* contended on appeal that their pleural scarring were nonconsented to alterations of their bodies, and as such, were grounds for compensation. *Id.* at 735, 591 A.2d 544. We held that mere alteration of the pleura is not a legally compensable injury, and thus the trial court's instructions to the jury were proper. We reasoned that

> [s]ections 388 and 402A of The Restatement (Second) of Torts (1965) identify "harm" as one of the necessary elements of a cause of action in both negligence and strict liability. The Restatement, in Section 7(2), defines "[t]he word 'harm' [as] used throughout the Restatement ... to denote the existence of loss or detriment in fact of any kind to a person resulting from a cause." Comment b to section 7 further explains that " '[h]arm' implies a loss or detriment to a person, and not a mere change or alteration in some physical person, object or thing.... In so far as physical changes have a detrimental effect on a person, that person suffers harm." These definitions, as used in the Restatement (Second) of Torts, have been cited with approval in Maryland.

*Id.* at 734, 591 A.2d 544. Mere exposure to asbestos and cellular changes resulting from asbestos exposure, such as pleural plaques and thickening, alone is not a functional impairment or harm, and therefore, do not constitute a legally compensable injury.[5] *Id.* In the instant case, Dr. Roggli testified for the plaintiffs that when asbestos fibers are inhaled they start causing cellular changes, but those cellular changes may not become mesothelioma, depending on the individual. Further, he stated that the cellular changes that occur before they become mesothelioma are not disease, according to Stedman's Medical Dictionary.

More recently, in *Edmonds v. Cytology,* 111 Md.App. 233, 681 A.2d 546, *cert. granted, Rivera v. Edmonds,* 344 Md. 330, 686 A.2d 635 (1996), we interpreted the word "injury" within the context of C.J. § 5–109(a), the statute of limitations for medical malpractice claims.[6] Section 5–109(a) is triggered when the "injury" occurs. *Id.* at 257, 681 A.2d 546. We stated, "A negligent misdiagnosis is not necessarily an 'injury' for purposes of limitations; a wrongful 'act' or 'omission' is not the same as an 'injury' ... the two need not necessarily occur simultaneously." *Id.* at 257, 681 A.2d 546. We held that "[t]o determine whether an injury has been 'committed' so as to trigger the limitations period in C.J. § 5–109(a)(1), the touchstone of the inquiry is whether the patient has suffered harm that is legally cognizable." *Id.* at 259, 681 A.2d 546. A legally cognizable wrong arises when a negligent act is coupled with some harm. *Id.* (citing *Hill,* 304 Md. at 696, 501 A.2d 27). In reaching our conclusion in *Edmonds,* we also reasoned that, if

---

**5.** This is not to say that immediate harm cannot arise shortly after exposure to asbestos fibers. In *Armstrong, quoting* Chief Judge Murphy in *Mitchell,* the Court stated that "despite the physicians disagreement as to the time when a change in the lungs may be classified as disease 'there was no disagreement that the inhalation and retention of asbestos fibers *may* cause immediate harm to the cells and tissues of the lung.'" *Armstrong II,* 326 Md. at 123, 604 A.2d 47 (quoting *Mitchell,* 324 Md. at 61, 595 A.2d 469).

**6.** Although § 5–109 does not apply to the instant case, our analysis in construing the word "injury" is instructive.

plaintiffs had filed suit against appellees immediately after their allegedly negligent acts, the "suit may have been dismissed for lack of damages ... that could be proven with reasonable certainty." *Id.* at 263, 681 A.2d 546. In *Edmonds,* we also relied on the holding of the Court of Appeals in *Oxtoby.* *Id.* at 259–60, 681 A.2d 546.

In *Oxtoby,* the Court of Appeals was asked to interpret the effective date clause of the Health Care Malpractice Claims Act, which requires claimants to submit to arbitration before seeking judicial remedies. *Oxtoby,* 294 Md. 83, 447 A.2d 860. The Act provides an effective date of July 1, 1976 and states that it "shall apply only to medical injuries occurring on or after that date." The Court rejected the definition of "injury" contained in § 7(1), comment *a* of the RESTATEMENT (SECOND) OF TORTS (1965), which states that the "invasion of a legally protected interest" could constitute an "injury," even in the absence of harm. The Court stated that the "Act is concerned with the invasion of a legally protected interest coupled with harm." The Court held that the invasion of the plaintiff's rights coupled with harm constitutes a medical injury and an actionable tort. *Id.* at 93, 447 A.2d 860.

We hold, therefore, that an injury occurs in an asbestos-related injury case when the inhalation of asbestos fibers causes a legally compensable harm. Harm results when the cellular changes develop into an injury or disease, such as asbestosis or cancer. We, therefore, reject appellants' assertion that the injury or harm does not arise until the symptoms of the disease become apparent. Appellants argue that such an approach would be less speculative. We disagree.

Some jurisdictions have concluded that a cause of action arises in asbestos-related disease cases when the asbestos fibers are inhaled. *Cole v. Celotex Corp.,* 599 So.2d 1058 (La.1992) (pinpointing the date that a cause of action arises "if dependent upon the date of contraction of the disease ... would require a hearing and the presentation of extensive medical evidence, and would work administrative havoc on our already burdened system"); *see also Koker v. Armstrong*

*Cork, Inc.,* 60 Wash.App. 466, 804 P.2d 659, 662–63 (1991) (held tort reform statute, which applies "to all claims arising on or after July 26, 1981, inapplicable to asbestos-related disease claims when the 'injury-producing' event, i.e. exposure to asbestos fibers, occurs prior to the effective date of the statute"); *Krivanek v. Fibreboard Corp.,* 72 Wash.App. 632, 865 P.2d 527 (1993) (harm results from the continuous exposure to asbestos fibers). In *Peterson v. Owens–Corning Fiberglas Corp.,* 43 Cal.App.4th 1028, 50 Cal.Rptr.2d 902 (1993), *review granted,* 54 Cal.Rptr.2d 693, 918 P.2d 997 (1996), a California court apparently rejected the concerns set forth in *Cole.* The court in *Peterson* stated that "[defendant] objects that a test hinging on the inception of an undetected disease will unnecessarily interject confusing and questionable medical testimony into asbestos trials, making outcomes uncertain and inviting speculation, manipulation of facts, and 'statistical guessing.' Of this parade of horribles, we agree that the test we set forth here will in most, if not all, cases require the testimony of medical experts." *Id.* at 1039, 50 Cal.Rptr.2d 902.

Other jurisdictions follow a similar approach in determining when a plaintiff's cause of action in an asbestos-related injury claim arises. In Hawaii, a federal district court, applying Hawaiian law, found on the evidence that pleural plaques or pleural thickening represented no functional impairment, and thus, no cause of action had arisen. *See In re Hawaii Fed. Asbestos Cases,* 734 F.Supp. 1563, 1567–68 (D.Haw.1990). Likewise, the Arizona intermediate appellate court held that plaintiffs' claims for personal injuries could not be maintained absent evidence of physical impairment, which was not shown merely because plaintiffs have asbestos fibers in their lungs which are causing changes in the lung tissue. *Burns v. Jaquays Mining Corp.,* 156 Ariz. 375, 752 P.2d 28, 30 (Ct.App. 1987).

Similarly, the Supreme Court of Maine was required to construe the effective date clause of a manufacturer liability statute. *Bernier v. Raymark Industries, Inc.,* 516 A.2d 534 (Me.1986). The clause provided that the "Act shall not be

construed to affect any cause of action arising prior to the effective date of this Act." *Id.* at 541. The court stated that there is no cause of action until a plaintiff has suffered an identifiable compensable injury. "In the context of asbestos-related injuries, it can take anywhere from ten to forty years from the time of actual asbestos fiber inhalation for injuries or diseases, if any, to manifest themselves." *Id.* at 542. The court concluded that an actionable harm arises when the disease manifests in the body and not from mere exposure to the potentially hazardous substances. *Id.* at 542; *see also Simmons v. Pacor, Inc.*, 543 Pa. 664, 674 A.2d 232, 237 (1996) (pleural thickening, absent physical impairment, is insufficient to sustain a cause of action). Similarly, the California intermediate appellate court, citing *Armstrong II* with approval, held that an "injury" occurs when a physiological change takes place that will, to a reasonable degree of medical certainty, result in the condition giving rise to the cause of action. *Peterson*, 50 Cal.Rptr.2d at 912–914.

Finally, appellees rely on *Mitchell, Inc. v. Maryland Casualty Co.*, 324 Md. 44, 595 A.2d 469 (1991) to support their position that an "injury" occurs when asbestos fibers are inhaled. In *Mitchell*, the Court of Appeals, interpreting the meaning of "bodily injury" within an insurance policy, held:

> Considering the plain meaning of the term "bodily injury," *as used in the policy*, and in light of the medical evidence concerning the development of asbestos-related diseases, we align ourselves with the overwhelming weight of authority in the country and conclude that "bodily injury" occurs when asbestos is inhaled and retained in the lungs.

*Id.* at 62, 595 A.2d 469 (emphasis added). Injury, however, may be interpreted differently depending upon the context in which it is being used. This interpretation is not applicable to the instant case. We follow the reasoning espoused in *Burns v. Jaquays Mining Corp.*, 156 Ariz. 375, 752 P.2d 28 (Ct.App. 1987) (quoting *Schweitzer v. Consolidated Rail Corp.*, 758 F.2d 936, 942 (3d Cir.1985)):

[T]he possible existence of subclinical asbestos-related injury prior to manifestation may be ... of vital concern to insurers and their insureds who have bargained for liability coverage triggered by "bodily injury." We believe, however, that subclinical injury resulting from exposure to asbestos is insufficient to constitute the actual loss or damage to a plaintiff's interest required to sustain a cause of action under generally applicable principles of tort law.

*Id.* 752 P.2d at 30.

▮▮ To summarize thus far, a cause of action arises in an asbestos-related injury claim for purposes of determining the applicability of C.J. § 11–108 when each of the elements of the claim are met. In Maryland, the injury element of a negligence claim is satisfied when a wrongful act is coupled with some harm. *See Armstrong I,* 87 Md.App. 699, 591 A.2d 544. "To set forth a viable claim for negligence, a plaintiff must allege, *inter alia,* 'damages.'" *Edmonds,* 111 Md.App. at 261, 681 A.2d 546. As we held in *Armstrong I,* a cause of action in an asbestos-related injury claim does not arise until the asbestos fibers inhaled into the lungs cause functional impairment. The Court's analysis in *Armstrong II* implies that such an injury occurs when the individual acquires the asbestos-related disease. *Armstrong II,* 326 Md. at 124, 604 A.2d 47. Although the Court in *Armstrong II* did not have to determine precisely when the asbestos-related "injury" occurred, it obviously looked beyond the date when plaintiff was exposed to asbestos and determined instead, when the earliest date of asbestosis would arise. *Id.* Based on *Armstrong* and other case law discussed *supra,* the statutory cap is not applicable to appellees' awards of noneconomic damages if their exposure to asbestos fibers caused them to develop mesothelioma prior to the effective date of the statutory cap, July 1, 1986.

Appellees argue that we have the benefit of hindsight and thus are aware that cell changes were permanent and caused functional impairment. Although that proposition may be true, the time at which the impairment occurred is still the date on which the cause of action arises. Prior to that date,

appellees would have had no cause of action had they filed a complaint. Thus, we must determine whether the mesothelioma existed prior to 1986.

The expert witnesses testified that, generally, mesothelioma begins to grow ten years prior to diagnosis. The time between development of cancer and diagnosis, however, could be anywhere from five to ten years. One expert testified that the cancer began, at the earliest, three years prior to diagnosis. At trial, an expert witness for the plaintiffs, Dr. Mark, a pathologist, testified about Granski's exposure to asbestos. Dr. Mark testified that every exposure that occurs prior to the tumor becoming malignant contributes to the development of the tumor. Dr. Mark further stated that typically the interval between the tumor starting and the diagnosis of mesothelioma is between six months and three years.

Dr. Gabrielson testified on direct that "probably sometime around 10 years before that cancer was recognized by the doctors, there was a tiny little cancer growing." Dr. Gabrielson also stated that the latency period for mesothelioma, the time from initial exposure to the time of diagnosis of the disease, ranges anywhere from eighteen to fifty years. Later, on cross-examination, defendants' attorney asked Dr. Gabrielson about his testimony concerning the latency period prior to diagnosis of mesothelioma. Dr. Gabrielson stated that "the time that [sic] cell has produced a clinically recognized tumor is on the order of five to ten years, probably more likely ten years ... I don't think there is any absolute measure of that."

Similarly, Dr. Roggli testified that "it takes on average approximately 10 years for the tumor to become diagnosable clinically from the time it starts growing its individual cancer cell." Dr. Roggli further explained that sarcomatoid tumors, which Grimshaw had, grew at a faster rate than biphasic variants of a mesothelioma, and begin growing sometime within five years prior to diagnosis. He further stated that epithelial cell-type mesothelioma, like that observed in Zumas, begin to grow sometime within ten years prior to diagnosis.

█ Unfortunately, we are without the benefit of the trial court's reasoning in denying appellants' motion to apply the statutory cap to noneconomic damages. We, therefore, must assume that the trial court denied appellants' motion to apply the statutory cap based on the expert testimony that mesothelioma occurred prior to July 1, 1986. Such a finding is not clearly erroneous because there is evidence in the record to support it. Dr. Gabrielson and Dr. Roggli testified that, typically, mesothelioma exists ten years prior to diagnosis. Although there was evidence in the record contrary to that of Dr. Gabrielson and Dr. Roggli, it was up to the trial court, as the trier of fact on that issue, to weigh the evidence and reach a final determination.

Plaintiffs Grimshaw, McCaffery, and Zumas were all diagnosed with mesothelioma in 1994, and plaintiff Granski was diagnosed with mesothelioma in 1993. Their causes of action, however, for purposes of C.J. § 11–108, arose when their bodies developed cancers, which was at least seven years prior to diagnosis in the case of Granski, and at least eight years prior to diagnosis in the cases of the other three plaintiffs. The record supports such a finding; therefore, we affirm the trial court's holding that the statutory cap for noneconomic damages for personal injury does not apply to the instant case.

█ Finally, appellants argue that, even if the statutory cap does not apply to the underlying personal injury claims, it must still apply to the consortium claims. The spouses of Zumas, McCaffery, and Granski all filed loss of consortium claims. "A claim for loss of consortium arises from the loss of society, affection, assistance, and conjugal fellowship suffered by the marital unit as a result of the physical injury to one spouse through the tortious conduct of a third party." *Oaks v. Connors,* 339 Md. 24, 33–34, 660 A.2d 423 (1995) (citing *Deems v. Western Maryland Railway Company,* 247 Md. 95, 100, 231 A.2d 514 (1967)).

█ The statutory cap, provided at C.J. § 11–108, applies to noneconomic damages. Section 11–108(a) states:

(1) "Noneconomic damages":

(i) In an action for personal injury, means pain, suffering, inconvenience, physical impairment, disfigurement, loss of consortium, or other nonpecuniary injury.

In *Oaks,* the Court of Appeals held that "a loss of consortium claim is derivative of the injured spouse's claim for personal injury, and therefore, a single cap for noneconomic damages applies to the whole action." *Oaks,* 339 Md. at 38, 660 A.2d 423. Loss of consortium is not a separate action. The Court reasoned that allowing a separate cap for loss of consortium claims "would circumvent the Legislature's intent to limit noneconomic damages and avoid double recoveries...." *Id.* at 38, 660 A.2d 423.

▮ In the case at bar, each plaintiff exposed to asbestos suffered personal injury when he or she developed mesothelioma, which was prior to 1986. It is true, however, that some of the harm plaintiffs suffered as a result of those personal injuries, i.e., loss of consortium, did not occur until after the effective date of the statute. The record indicates that the Granskis' marital life changed when Mrs. Granski entered the hospital in the summer of 1993. Mrs. McCaffery testified that her husband was fine until October 1993 when he was admitted to the hospital and underwent a biopsy and doctors discovered that he had mesothelioma. A videotaped deposition of Mr. Zumas taken prior to trial was played at trial. Mr. Zumas testified that up until 1992 his health was good. Zumas testified that, beginning in October 1993, his health was a "lousy, living hell." Mr. Zumas underwent an operation in July 1994 when he was diagnosed with mesothelioma.

Although plaintiffs continued to suffer damages, as a result of their personal injuries, after the effective date of the statute, as in *Oaks,* the cause of action arose prior to the effective date. *Oxtoby,* 294 Md. at 97, 447 A.2d 860 (the fact that some of the monetary compensation sought was for harm arising after the effective date, did not make the statute applicable when the cause of action arose prior to the effective date); *see also Johns Hopkins Hospital v. Lehninger,* 48 Md.App. 549, 429 A.2d 538 (1981); *Dennis v. Blanchfield,* 48

Md.App. 325, 428 A.2d 80 (1981), *modified,* 292 Md. 319, 438 A.2d 1330 (1982) (both these cases stand for the proposition that a medical injury occurs, within the meaning of the effective date clause, even though all of the resulting damage to the patient has not been suffered prior to the Act's effective date).

Therefore, we conclude that appellees' claims for damages resulting from their personal injuries, including damages for loss of consortium, arose prior to the effective date of the statute and, therefore, are not subject to the statutory cap. Damages resulting from appellees' wrongful death claims, however, should be reduced in accordance with C.J. § 11–108(b).

## II

## CONFIDENTIALITY OF THE SETTLEMENT AGREEMENTS

 Following the jury verdicts, the trial court made statutory adjustments to compensatory damages. The Uniform Contribution Among Tort–Feasors Act (UCATA), MD. CODE (1957, 1994 Repl.Vol.), Art. 50, § 19 provides:

A release by the injured person of one joint tort-feasor, whether before or after judgment, does not discharge the other tort-feasors unless the release so provides; but reduces the claim against the other tort-feasors in the amount of the consideration paid for the release, or in any amount or proportion by which the release provides that the total claim shall be reduced, if greater than the consideration paid.

The purpose of the Act is to prevent double recovery. *Armstrong II,* 326 Md. at 126, 604 A.2d 47. Thus, "[t]he amount recoverable from the nonsettling defendant when added to the amount recoverable from the settling defendant cannot exceed the plaintiff's verdict." *Id.*

In the instant case, at the conclusion of trial, the court adjusted the amount of judgments entered in favor of each of

the parties to take into account the various settlements. The court asked the parties "to prepare for the Court final judgments in each of these cases taking into account all of the settlements are [sic] involved ... please submit to the court no later than ... January 2nd so that the Court can then enter final judgments."

As a result of the court's instructions, plaintiffs submitted proposed final judgments, as did defendant O–I. Appellants, however, argue that the information needed to make a determination under MD.CODE (1957, 1994 Repl.Vol.), Art. 50, § 19 was supplied to the court *ex parte,* and sealed without notice or stated justification. Appellants argue that the trial court erred when it denied Porter Hayden's motions to compel production of the information that was delivered *ex parte* and used to adjudicate the defendants' liability.

Appellees argue that plaintiffs have never been required to provide defendants with settlement information, because of the ongoing nature of the litigation. In fact, appellees contend, both parties have an interest in non-disclosure of settlement amounts because such information may affect future settlement negotiations in other cases. Such a practice of confidentiality, appellees contend, is customary in asbestos-related cases in Baltimore City.

We conclude that appellees' submissions were not *ex parte. Ex parte* communication is a communication about a case that an adversary makes to the decision maker without notice to an affected party. A judicial proceeding, order, or injunction is said to be *ex parte* when it is taken or granted at the instance and for the benefit of one party only and without notice to or contestation by, any person adversely interested. *See generally Caldwell v. State,* 51 Md.App. 703, 445 A.2d 1069 (1982). Here, both parties were given the opportunity to submit information to the court with regard to settlement releases and proposed final judgments. Moreover, O–I did submit proposed orders. Thus, appellants' rights were not denied under MD. RULE 1–351 (delineates circumstances when court may proceed *ex parte* ).

Prior to the entry of any final order, appellants had notice that the materials were submitted to the court for review. In addition, appellants were not prejudiced by the court's refusal to produce the information submitted by appellees because they possessed the information necessary to determine the correct application of UCATA. In the cases of Zumas, McCaffery, and Granski, all parties were aware of the total value of the judgment, the number of joint tort-feasors, the pro rata share amount, the release types, and the fact that no settlement exceeded the pro rata share amount. In the Grimshaw case, seven settlements exceeded the pro rata share amount and two did not. The court properly reviewed the settlement amounts and applied the provisions of UCATA to determine the appropriate set-offs.

Finally, we find no merit in appellants' argument that the trial court improperly sealed the information used to reach its determination. In *Owens–Corning Fiberglas Corp. v. Garrett,* 343 Md. 500, 530, 682 A.2d 1143 (1996), the Court followed this same procedure when adjusting the compensatory award under the UCATA. *Id.* at 531, 682 A.2d 1143 (the precise terms of the settlement were sealed by the trial judge and not made a part of the record on appeal). Appellants rely on *Baltimore Sun v. Colbert,* 323 Md. 290, 305–6, 593 A.2d 224 (1991) (notice must be provided prior to counsel's request to seal). *Baltimore Sun* is not analogous to the case at bar. Nor is there merit in appellants' argument that sealing the information deprived defendants of their opportunity to move, pursuant to MD. RULE 2–535, to correct any error made in calculating the judgment. Because the information was properly sealed, appellants' rights were not denied under MD. RULE 2–535.

### III

### MANVILLE TRUST

Each of the plaintiffs involved in this appeal settled a claim for mesothelioma against Johns–Manville Corporation with the Manville Personal Injury Trust (Trust). The Trust was created in 1988, pursuant to the bankruptcy-court-approved Second

Amended and Restated Plan of Reorganization of Manville, and it assumed liability for all health claims brought against Manville and "Other Asbestos Obligations" of Manville. Plaintiffs in the case at bar are beneficiaries of the Trust, as are codefendants, formerly joined with Manville in asbestos-related litigation.[7] The number of claims filed against the Trust were far greater than the bankruptcy court anticipated, and as a result, the Trust became insolvent, which led to a series of cases beginning in November 1990 to restructure the Trust. *In Re Joint Eastern & Southern Dist. Asbestos Litig.,* 982 F.2d 721 (2d Cir.N.Y.1992), *modified,* 993 F.2d 7 (2d Cir.N.Y. 1993).

The class action brought against Manville was settled during trial. The Settlement Agreement provides that the rights and duties of the Trust and all class members are governed by the Trust Distribution Process (TDP). The TDP sets forth the procedures for processing and evaluating claims against the Trust "with the intention of paying all claimants over time as equivalent a share as possible of their claims' value." *In Re Joint Eastern & Southern Dist. Asbestos Litig.,* 78 F.3d 764, 769 (2d Cir.N.Y.1996) (hereinafter *Manville V* ). TDP provides that any unresolved dispute about the value of a claim is subject to arbitration, and if the dispute is not resolved by arbitration, the claimant may pursue a tort suit against the Trust. *Id.* at 770. The TDP also governs codefendant claims against the Trust by providing set-off and contribution rules. The Trust is to be treated as a joint tortfeasor without the need to introduce any proof. Section H.3 of the TDP refers to local law for the calculation of the set-off.

In *Manville V,* the court stated that the TDP recognizes different rules in three categories of states:

---

7. A total of six subclasses were designated. The three plaintiff subclasses are present claimants, future claimants, and claimants with pre-November 19, 1990 settlements and judgments. The three defendant subclasses are the codefendant manufacturers, consisting of former asbestos-product manufacturers regularly sued as codefendants with Manville or the Trust, the MacArthur Subclass, and the Manville distributors.

pro tanto states, in which the judgment against non[-]settling defendants is reduced by the amount paid or agreed to be paid by a released party; pro rata states, in which the total liability is divided equally among all defendants held to be legally responsible tort[-]feasors, and the judgment is reduced by a released party's pro rata share of liability; and apportionment states, in which liability is apportioned by the fact[ ]finder among those found to be tort[-]feasors, and the amount of the judgment is to be reduced with reference to the apportioned share of a released or absent tort[-]feasor.

*Id.* at 770–71. In pro rata and pro tanto states, the TDP alters state set-off rules by "indemnifying the Trust against contribution claims arising from judgments obtained by health claimants, if a set-off credit is awarded by the trial court in accordance with the TDP and local law." *Id.* at 771.

Only one issue was left unresolved by the Settlement Agreement. Plaintiffs who resided in Maryland contended that the set-off provisions of the TDP dealt with them in a way unpermitted by Maryland law, and that they were treated unfairly in comparison with other plaintiffs. The parties agreed that the TDP set-off provisions would be inapplicable to claims arising under Maryland law and the parties consented to have the federal court determine appropriate set-off rules that should be applied in claims arising under Maryland law. *Id.* at 771. On February 21, 1996, the Second Circuit issued an order requiring the district court to resolve this issue by predicating "how the Maryland Court of Appeals would apply Maryland set-off principles ... in the context of the present Settlement." *Id.*

On May 13, 1996, the federal district court, interpreting Maryland law, held:

In cases tried to verdict, the Trust shall not be counted as a joint tort[-]feasor in calculating the value of the statutory pro rata shares of the verdict. If the plaintiff has settled his or her claim with the Trust at or before the time judgment is entered, the judgment against any non-settling

tort[-]feasors shall be reduced by the amount of the settlement. Where there is more than one such non-settling tort[-]feasor, they shall share the benefit of such reduction on a pro rata basis.

*Manville VI,* 929 F.Supp. 1 (E.D.N.Y. and S.D.N.Y.1996). The court held that its interpretation should be applied in Maryland asbestos cases involving the Trust.

Meanwhile, the jury returned special verdicts in favor of plaintiffs against codefendants on December 21, 1995 in the Circuit Court for Baltimore City. The trial judge, taking account of appropriate release and settlement agreements, made statutory adjustments to compensatory damages and issued final judgments in *Zumas* and *Granski* on March 11, 1996, in *McCaffery* on April 15, 1996, and in *Grimshaw* on April 16, 1996. The court accounted for the Trust in *McCaffery* and *Zumas* by taking a pro tanto reduction. Similarly, in *Grimshaw,* the court stated that under the terms of the Manville bankruptcy, the Trust is considered to be a joint tort-feasor, but "that the judgment in the instant case is only to be reduced by the actual amount of the settlement by the Trust." Likewise, in *Granski,* the court stated that the Trust is to be considered a joint tort-feasor and the defendant is entitled to a pro tanto deduction in the amount of $20,000 from the damages awarded by the jury.

The court entered final judgments after the Second Circuit had remanded the Manville Trust proceedings to the New York district court to decide the appropriate application of Maryland law under the settlement agreement. In addition, the circuit court was aware of the Second Circuit's decision when, on March 11, 1996, OC filed an objection to, and motion to stay, entry of final judgment pending the decision by the federal court. In addition, on May 14, 1996, Porter Hayden filed a motion to revise the April 16, 1996 judgment in the Grimshaw case, pursuant to MD. RULE 2–535, to comply with the controlling May 13, 1996 order of the federal district courts. The circuit court, however, did not exercise its revisory powers.

Appellants assert that "the judgments in each of these cases fails to appreciate federal jurisdiction over this question, and fails to apply the controlling order in determining the effect of the Trust settlements on the judgments below." The trial court, in our view, had fundamental jurisdiction to adjust compensatory damages and issue a final judgment in the instant cases. Fundamental jurisdiction is "the power residing in [a] court to determine judicially a given action, controversy, or question presented to it for decision." *Pulley v. State,* 287 Md. 406, 415, 412 A.2d 1244 (1980) (quoting *Fooks' Executors v. Ghingher,* 172 Md. 612, 621, 192 A. 782 (1937)). "If by that law which defines the authority of the court, a judicial body is given the *power* to render a judgment over that class of cases within which a particular one falls, then its action cannot be assailed for want of subject matter jurisdiction." *First Federated Commodity Trust Corp. v. Comm'r of Sec.,* 272 Md. 329, 335, 322 A.2d 539 (1974). In *Pulley,* the Court also stated that "merely because a trial may continue when an appeal is taken from an interlocutory order does not mean that a trial judge should normally do so...." *Pulley,* 287 Md. at 417, 412 A.2d 1244.

In *Pulley,* the Court held that the defendant's filing of an interlocutory appeal, challenging the denial of a motion to dismiss based on double jeopardy grounds, absent a stay, rule or statute, did not suspend the trial court's jurisdiction during the pendency of the appeal. A trial court's fundamental jurisdiction may be interrupted by statute, rule, or a stay granted by an appellate court or the trial court. *Id.* at 417, 412 A.2d 1244; *see also McNeil v. State,* 112 Md.App. 434, 459–460, 685 A.2d 839 (1996). In the case at bar, no stay order requiring the court to suspend its jurisdiction pending the federal decision was granted. Therefore, the lower court did not have to consider the federal district court's interpretation of the settlement release before issuing a final judgment under the UCATA against the nonsettling defendants.

In addition, the federal court's decision does not control the circuit court's ultimate conclusion. Maryland set-off rules aim to have each defendant pay its pro rata share and the plaintiff

to receive the full amount of his or her judgment from the responsible tort-feasors. The assumption under the Maryland's statutory scheme is that nonsettling codefendants can seek contribution from settling defendants.[8] The trial court's conclusion was not dependent upon the conclusion reached in the federal court. The circuit court had, *inter alia,* the authority to "distribute" the verdict reached by the jury between the codefendants in accordance with the UCATA. The settlement agreement makes clear that the Trust is a joint tort-feasor. According to the TDP, the Trust paid ten percent of its pro rata share. The court, thus, treated the Trust as a pro tanto releasee.

Pro rata share is not defined in the UCATA. In *Lahocki v. Contee Sand & Gravel Co.,* 41 Md.App. 579, 398 A.2d 490 (1979), we stated that "pro rata" is a generic term meaning in a proportion, related in legal use to dollars as often as it is to people. *Id.* "A pro rata contribution by its most extended colloquial connotation means no more than an aliquot division, i.e., that no one person will be compelled to bear the whole, or more than his just share of the common binder or obligation." *Id.* at 619, 398 A.2d 490. A pro tanto release, on the other hand, means partial payment made on a claim. A pro tanto set-off does not extinguish a joint tort-feasor's right of contribution against a settled joint tort-feasor. MD.CODE (1957, 1994 Repl. Vol.), Art. 50, §§ 19 and 20.

Appellant does not specifically assert that the circuit court's ruling with respect to application of Maryland set-off rules

---

8. The federal district court observed in its interpretation of Maryland law with regard to the Trust that "where no contribution substantially over 10% of matrix values is ordinarily available from the Trust ... [the Maryland statutory scheme] is subverted." *Manville,* 878 F.Supp. at 551. The Trust is a settling defendant stipulating to joint tort-feasor liability, but is unable to pay for its share of plaintiff's damages. *Id.* If the Trust is treated as a pro tanto releasee, the codefendant is forced to shoulder a larger share of the judgment than may be intended by Maryland law. If, on the other hand, the Trust is treated as a pro rata settlor, plaintiffs would remain uncompensated for the difference between the Trust's pro rata share of liability and the dollar amount paid for the release. *See Manville V,* 78 F.3d at 773.

was error, but that the court did not have the authority to determine the question addressed because authority over that question was vested in federal district courts and "the interpretation of the Trust settlement employed into the judgments has been definitively rejected" by the federal court in *Manville VI*. No appeal is taken from the trial court's decision other than it should not have decided the issue when it did and it should have conformed to the federal court's decision. For the reasons stated *supra*, we disagree and affirm the circuit court's judgment with respect to the Manville Trust.

## IV

### STIPULATED DAMAGES IN *GRIMSHAW*

Appellants argue that the trial court erred in denying appellant Porter Hayden's unopposed motion in the Grimshaw case for *remittitur*, or in the alternative, a new trial. The motion requested the court to conform the judgment for economic damages, awarded by the jury, to the amount stipulated by the parties. At trial, the parties stipulated that the total amount of medical expenses was $18,017.74. There is no evidence of economic loss other than the stipulated medical expenses.

In *Bloom v. Graff,* 191 Md. 733, 63 A.2d 313 (1949), the Court held that "[w]here such a stipulation is agreed to by counsel the orderly trial of the case demands that the parties be bound thereby." *Id.* at 736, 63 A.2d 313. In *Bloom,* during trial, the attorney for plaintiff stated in open court that it was stipulated and agreed between counsel for the parties that if a verdict is returned in favor of the plaintiff, it should be in the amount of $896.09. *Id.* at 735–6, 63 A.2d 313. The jury returned a verdict in favor of the plaintiff for $250. *Id.* The Court, quoting *Inloes v. American Exchange Bank,* 11 Md. 173, 185 (1857), stated, "[F]inding of fact must be left to the jury; but this is not necessary when the case is tried upon admissions at the bar. The jury may discredit the testimony, but cannot find contrary to the agreement of the parties." *Id.* at 737, 63 A.2d 313; *see also State v. Broberg,* 342 Md. 544,

559, 677 A.2d 602 (1996) (parties are bound by their stipulations).

A trial court, however, may decline to accept a stipulation if it finds that the facts of the stipulation are untrue, or if one of the parties can show that the stipulation should be set aside based on contract principles of collusion, fraud, mutual mistake, or other grounds that would justify setting aside of a contract. *See Peddicord v. Franklin,* 270 Md. 164, 310 A.2d 561 (1973) ("Ordinarily, courts have no power to permit juries to make findings contrary to the terms of a stipulation of the parties in the case."); *see also C & K Lord, Inc. v. Carter,* 74 Md.App. 68, 94, 536 A.2d 699 (1988). In the case at bar, appellees did not object to the stipulation at trial, nor did they oppose appellants' motion for *remittitur.* Moreover, appellees make no argument on appeal and thus do not assert any reason why the stipulation should not be accepted.

We hold that the stipulation is binding on the parties, and, therefore, that the trial court abused its discretion when it denied appellants' motion for *remittitur* to reduce the jury award of $100,000 for medical expenses to the stipulated amount of $18,017.74. That error, however, does not require a new trial. The liability of the parties has been determined by the verdict of the jury and the amount of damages by the stipulation. The *Grimshaw* case is remanded to the trial court to enter judgment on economic damages consistent with this opinion.

# V

## WESTINGHOUSE'S LIABILITY IN GRIMSHAW

In *Grimshaw,* the jury returned a verdict against third-party defendant Westinghouse in favor of third-party plaintiff, Owens–Corning (OC). On March 11, 1996, the lower court entered final judgment in *Grimshaw,* stating that, although plaintiff never sued Westinghouse, the jury found it to be a joint tort-feasor, and the court would consider Westinghouse in adjusting the verdicts for compensatory damages in accor-

dance with Md.Code (1957, 1994 Repl.Vol.), Art. 50, §§ 16–24. On April 1, 1996, OC filed a notice of appeal to this Court. On April 10, 1996, Westinghouse simultaneously filed a notice of appeal and a motion requesting the trial court to revise its judgment in the Grimshaw case to state that Westinghouse is not a joint tort-feasor.

On April 16, 1996, the court issued a subsequent order vacating the verdict against Westinghouse in favor of OC "because Westinghouse erroneously appeared on the verdict form as a third-party defendant after all claims against Westinghouse had been waived or withdrawn by Owens–Corning Fiberglas." The final judgment, nevertheless, counted Westinghouse as an adjudicated joint tort-feasor without any settlement release when it adjusted the jury verdicts in accordance with Md.Code (1957, 1994 Repl.Vol.), Art. 50, §§ 16–24.

Appellants [9] contend that the trial court's judgment is flawed, and as a result, joint and several liability to the plaintiff was increased. Appellants argue that in order for someone to be adjudicated a joint tort-feasor, he, she, or it must be party to the adjudication. *Swigert v. Welk*, 213 Md. 613, 622, 133 A.2d 428 (1957) ("It would create a somewhat incongruous procedural situation to have a party to a case completely dismissed and leave the question of his negligence yet to be determined."). Westinghouse was never sued by plaintiff. According to the verdict in *Grimshaw*, thirteen parties were found to be joint tort-feasors, and nine of the thirteen were given releases by the plaintiff, pursuant to Md.Code (1957, 1994 Repl.Vol.), Art. 50, §§ 19 and 20. Appellants assert that the court's error, in counting Westinghouse as an unreleased joint tort-feasor, increases the joint and several liability to the plaintiff from 3/12 (twenty-five percent) to 4/13 (thirty-one percent) of the compensatory damages. The court, however, held that Westinghouse has no contribution liability. Appellants argue they "cannot justly be made to

---

**9.** The three non-settling appellants are OC, Porter Hayden, and Anchor. OC only joins appellants if it is determined that the court did not err in denying OC the benefit of the verdict against Westinghouse.

pay the share of Westinghouse." Therefore, appellants request that the trial court's judgment be revised to assign Westinghouse as either a proper party or not include it as an adjudicated joint tort-feasor.

Before reaching the issue presented to us by appellants, we will address the issues presented by appellant OC, third party plaintiff below, in a separate brief. OC argues that the trial court did not have jurisdiction to revise the March 11, 1996 judgment after both Westinghouse and OC noted appeals. In the alternative, OC argues that the trial court erred in vacating the March 11, 1996 judgment because OC did not waive or otherwise withdraw its valid third-party complaint against Westinghouse for contribution.

■■■ The trial court did not have jurisdiction, in our judgment, to revise the March 11, 1996 judgment. In *Unnamed Atty. v. Attorney Griev. Comm'n*, 303 Md. 473, 486, 494 A.2d 940 (1985), the Court held:

> A motion filed more than ten days after a judgment but within thirty days of the judgment, under Rule 2–535(a), would still have no effect upon the running of the thirty-day appeal period. When such a motion is filed, and while it is pending an appeal is filed, appellate jurisdiction attaches and the circuit court cannot decide the motion. But where a motion is filed within ten days, an appeal will not ordinarily lie until the trial judge rules on the motion.

In the case at bar, on April 10, 1996, Westinghouse filed a motion to revise the March 11, 1996 judgment, pursuant to MD. RULE 2–535(a). That motion was filed more than ten days after the final judgment. Appellant OC, however, filed an appeal on April 1, 1996. At that point, "appellate jurisdiction attaches and the circuit court cannot decide the motion." *Id.* at 486, 494 A.2d 940. Consequently, the trial court had no jurisdiction to revise the March 11, 1996 judgment; therefore, the April 16, 1996 order is stricken.

■■■ We now turn to the issue presented on appeal by OC and Westinghouse: whether OC waived or abandoned its third-party claim in the *Grimshaw* case. OC argues that a

waiver of legal rights only occurs when there is a voluntary and intentional relinquishment of known rights and privileges. OC maintains that it did not surrender its third-party claim against Westinghouse, and it was Westinghouse's own lack of diligence that led to the present judgment. While Westinghouse admits that a valid third-party claim existed and that it had knowledge of such a claim, it asserts that OC waived its claim against Westinghouse when it failed to respond affirmatively to questions asked by the court with regard to the claim.

The chronology of events surrounding this appeal is as follows. On February 16, 1995, OC filed a third-party claim against Westinghouse in *Grimshaw.* On March 22, 1995, Westinghouse filed a motion to dismiss OC's third-party claim, based on failure to comply with MD. RULE 2–332. Then, on May 23, 1995, Westinghouse filed an answer to OC's third-party complaint. On September 8, 1995, Westinghouse filed a pretrial statement in which it stated that OC dismissed its third-party complaint against Westinghouse in *Grimshaw.* On September, 11, 1995, OC filed a pretrial statement and named Westinghouse as a party against whom it would pursue a contribution claim. On September 12, pretrial hearings began.

At the pretrial hearings, the judge used a "roll call" procedure in which he required plaintiffs to identify all defendants sued by them who are either settled or not settled, and all non-settled defendants to identify all cross-claims and third-party claims being pursued. During the initial roll call, OC stated that it had a third-party claim against Westinghouse. Edward Houff, from the Law Offices of Church & Houff, Ric Gass, and John Stump, all representing Westinghouse, were in the courtroom during this roll call.

Another roll call was conducted on September 18, 1995 because, as the court noted, "[T]here has been some movement since you were last here last week." At this time, OC again stated that it had a third-party claim against Westinghouse. On September 20, 1995, the court conducted another roll-call. After reading the names of all parties sued by the

plaintiffs, the court stated, "Third-party claims, Hopeman Brothers and OCF." Counsel for Porter Hayden responded, "I think Porter–Hayden is the only one keeping Westinghouse in the case." Counsel for Hopeman Brothers corrected Mr. Duvall and stated that it still had an active third-party claim against Westinghouse. The court then stated, "So Westinghouse is still in." The attorney for Westinghouse responded, "Okay, Judge."

On September 21, 1995, counsel for Westinghouse stated that "[t]he only thing I am left in is the third-party complaint by Hopeman in Grimshaw." Westinghouse apparently filed a motion for want of sufficiency of process in November 1994 and advised Hopeman's counsel that it had no evidence of a summons being served on it. Counsel for Hopeman stated that he would check his records and get back to Westinghouse. On September 25, 1995, the court conducted yet another roll call. At this time, Hopeman dismissed its third-party claim against Westinghouse and the court signed the order. The court did not ask OC whether it had a third-party claim against Westinghouse, but at the end of the roll call for the *Grimshaw* case the court asked, "Any parties in Grimshaw that the Court missed?" OC did not respond.

During trial, OC presented evidence in support of its third-party claim against Westinghouse. On December 13, 1995, during the trial, OC reaffirmed its cross-claim against Westinghouse, and counsel for Westinghouse was present in the courtroom. At the conclusion of trial, the judge held a hearing on the proposed jury instructions and verdict sheets. Later, the court circulated the proposed verdict sheets. With respect to the *Grimshaw* case, the court recorded on the verdict sheet that only OC had a third-party claim against Westinghouse. During the hearing, the court discussed with the parties how to list OC's claim against Westinghouse on the verdict sheet. The court noted "there is one additional cross/third-party defendant as to Owens–Corning Fiberglas that is not common to all of them and that is Westinghouse." Westinghouse's counsel, Mr. Loker, was present during that hearing and questioned as to his opinion on the verdict sheet, to

which he did not have a comment. Finally, the court provided all counsel with the final verdict sheets, before submitting them to the jury, and asked that each counsel ensure that they contained the correct information.

After the jury commenced deliberations and before a verdict was returned, Mr. Loker wrote to the court on December 21, 1995 stating that, while his office acts as local counsel for Westinghouse, he was principally involved to protect the interests of two of the other defendants.

> In reviewing the transcript of the proceedings where the verdict sheet was discussed, it dawned on me that, while [Westinghouse] is listed as a third-party defendant at the suit of the third-party plaintiff, [OC], in the Grimshaw case, [OC] in fact never served a third-party complaint upon [Westinghouse]. Also, plaintiffs in the Grimshaw case never filed a direct claim against [Westinghouse], so it cannot be considered a cross-defendant.

The jury returned a verdict against Westinghouse. Mr. Loker wrote to the judge again extending "sincere apology for sending you my previous, and now inaccurate, correspondence. Westinghouse has located the third-party complaint and summons served by Owens–Corning Fiberglas in the Grimshaw case." Mr. Loker, nevertheless, requested that the court remove Westinghouse from the verdict form, asserting that OC had numerous opportunities to assert the existence of its claim against Westinghouse, but remained silent. Counsel for OC also sent a letter to the court stating that it considered Westinghouse a third-party defendant. The court then issued its final order in the case of *Grimshaw* on March 11, 1996.

 One fact is clear, i.e., that with the enormous amount of documentation in this case, such confusion could arise. The waiver of legal rights, however, must be a clear, voluntary, and intentional relinquishment or abandonment. *See Holder v. Maaco Enterprises*, 644 F.2d 310, 312 (4th Cir.Md.1981); *Dahl v. Brunswick Corp.*, 277 Md. 471, 486, 356 A.2d 221 (1976). The facts discussed above indicate that at no point during trial or pretrial hearings did OC voluntarily or inten-

tionally relinquish its third-party claim against Westinghouse. No order to dismiss was submitted with regard to the third-party claim against Westinghouse, as was done in the case of Hopeman. The procedure utilized by Hopeman in dismissing its third-party claim against Westinghouse illustrates that more than just a statement was necessary to dismiss a properly served third-party claim.

We reject Westinghouse's argument that OC is equitably estopped from asserting its claim against Westinghouse.[10] Westinghouse argues that OC is estopped from asserting a claim under Maryland law because it had an opportunity and a duty to identify Westinghouse as a third-party defendant, but remained silent. Westinghouse, however, also has unclean hands. Westinghouse was served with a third-party complaint and was present, at the beginning of trial, when OC affirmed its claim against them. In addition, OC stated its claim against Westinghouse in its pretrial statement, and Westinghouse was listed on the verdict sheet. The third element of equitable estoppel, therefore, is not met: "to a party who was without knowledge or means of knowledge of the real facts." Westinghouse knew or should have known a claim was filed against it by OC and it could have acted to clarify whether that claim was still valid. Thus, we reject its argument that it should be excused from the claim without any discussion or the signing of an order dismissing the claim.

OC did not surrender its third-party claim against Westinghouse; therefore, we affirm the March 11, 1996 order implicating Westinghouse as a third-party defendant. Our conclusion also resolves the issue presented by the joint appellants. Having reversed the trial court's conclusion that Westing-

10. Westinghouse states that there are five elements of equitable estoppel: (1) a false representation or concealment of material facts; (2) made with knowledge, actual or constructive, of the facts; (3) to a party who was without knowledge or means of knowledge of the real facts; (4) with the intention that it should be acted on; (5) and the party to whom it was made must have relied on or acted on it to his prejudice. To establish estoppel by silence there must also be (1) an opportunity to speak; and (2) an obligation or duty to speak.

house was not subject to contribution liability from OC, the rest of the court's judgment, counting Westinghouse as a joint tort-feasor, properly stands.

## VI

### DEFAULT JUDGMENT IN GRIMSHAW

■■■ Appellant/third-party plaintiff Porter Hayden argues that the trial court erred when it entered a default judgment in its favor against third-party defendant Babcock & Wilcox Company (B & W) for contribution but declined to reduce Grimshaw's award on a pro rata basis. Grimshaw settled its claim against B & W when the parties entered into a *Swigert* type release. Porter Hayden filed a motion seeking the entry of an order of default judgment against B & W. On August 30, 1995, pursuant to MD. RULE 2–433(a)(3), the court entered a judgment by default in favor of Porter Hayden against B & W. On March 21, 1996, Porter Hayden filed a motion to revise the final judgment in *Grimshaw,* pursuant to MD. RULE 2–535. Porter Hayden contended that the March 11, 1996 final judgment did not account for the default judgment on Porter Hayden's claim for contribution against B & W. Porter Hayden requested the court to reduce the March 11, 1996 judgment in accordance with B & W's status as a joint tortfeasor with a pro rata release. The court granted Porter Hayden's motion to revise on April 15, 1996 and ordered that the March 11, 1996 judgment be revised to account for the default judgment. Nevertheless, the court did not reduce the judgment against Porter Hayden in consideration of the default.

According to the release agreement entered into between Grimshaw and B & W, in order for Porter Hayden to be entitled to a decrease or pro rata reduction of the damages claimed by Grimshaw, it must be adjudicated that the releasees are joint tort-feasors. MARYLAND CODE (1957, 1994 Repl. Vol.), Art. 50, § 19 provides:

A release by the injured person of one joint tort-feasor, whether before or after judgment, does not discharge the other tort-feasors unless the release so provides; but re-

duces the claim against the other tort-feasors in the amount of the consideration paid for the release, or in any amount or proportion by which the release provides that the total claim shall be reduced, if greater than the consideration paid.

At trial, however, it was not established that B & W was a joint tort-feasor.

We reject appellant's argument that the default judgment should be substituted for an adjudication on the merits. According to UCATA § 16(a), which defines joint tort-feasor, the default judgment does not establish that B & W is "jointly or severally liable in tort for the same injury to [Grimshaw]...." *See also Loh v. Safeway Stores, Inc.,* 47 Md.App. 110, 422 A.2d 16 (1980) (when one claiming no liability obtains a release for himself from the injured party, the liability of others is not affected).

The release in the instant case limits plaintiff's rights of recovery against nonsettling defendants only in the event that B & W is an adjudicated joint tort-feasor. A judicial determination of liability or non-liability settles the question of whether a cross-defendant is a joint tort-feasor under the UCATA. In *Swigert,* the Court stated, "The act does not specify the test of liability. Clearly, something short of an actual judgment will suffice; we think it equally clear that a denial of liability will not." *Swigert,* 213 Md. at 619, 133 A.2d 428. In *C & K Lord, Inc.,* 74 Md.App. 68, 536 A.2d 699, examining a similar release, we quoted *Allgood v. Mueller,* 307 Md. 350, 355, 513 A.2d 915 (1986):

· For the non[-]settling defendant to get the benefit of the reduction solely by operation of statutory law, the settling defendant and the non[-]settling defendant must be "persons jointly or severally liable in tort for the same injury to person or property, whether or not judgment has been recovered against all or some of them."

*Id.* at 74, 536 A.2d 699 (citing UCATA § 16(a)). We held that the settling defendants were not joint tort-feasors under the Act because they had been granted summary judgment, and in absence of an express contractual agreement between the

settling defendants who were not joint tort-feasors under the UCATA and the nonsettling defendant, the nonsettling defendant was not entitled to a reduction in the jury verdict against it. *Id.* at 74, 536 A.2d 699. *See also Collier v. Eagle–Picher Industries, Inc.*, 86 Md.App. 38, 585 A.2d 256 (1991) (judicially determined not liable are not joint tort-feasors under the UCATA). *Compare Swigert*, 213 Md. 613, 133 A.2d 428 (release stated that the releasee was not admitting liability, but that the claims recoverable against all other persons would be reduced to the pro rata share without regard to whether the releasee was an adjudicated joint tort-feasor).

In the case *sub judice*, the trial court lacked the authority under the release agreement and the UCATA to reduce Porter Hayden's pro rata share of the judgment because it was not established that B & W was a joint tort-feasor. It was proper for the court to enter a final judgment because there were no remaining cross-claims, as default judgment had been entered against B & W. *Compare Keene Corp. v. Levin*, 330 Md. 287, 623 A.2d 662 (1993) (final judgment may not be entered until cross-claim liability determined, because if a cross-defendant is liable as a joint tort-feasor, there is a right of contribution that may reduce the amount of judgment). *Owens–Corning Fiberglas Corp.*, 343 Md. at 530, 682 A.2d 1143.

## VII

### SUBSTANTIAL FACTOR CAUSATION OF ANCHOR IN *GRIMSHAW*

 Anchor contends that the trial court erred when it submitted its liability in *Grimshaw* to the jury even though Grimshaw failed to prove that asbestos-containing gaskets or packing products sold by Anchor were a substantial factor in the development of his mesothelioma. A litigant is entitled to have his theory of the case presented to the jury if that theory of the case is a correct exposition of the law and there is some evidence in the case to support it. *Sergeant Co. v. Pickett*, 285 Md. 186, 194, 401 A.2d 651 (1979); *E.G. Rock, Inc. v. Danly*, 98 Md.App. 411, 420, 633 A.2d 485 (1993); *Edmonds v. Mur-*

*phy,* 83 Md.App. 133, 178 n. 28, 573 A.2d 853 (1990), *aff'd* 325 Md. 342, 601 A.2d 102 (1992). Therefore, we must determine whether there was any evidence adduced at trial from which a jury could reasonably conclude that the products sold by Anchor were a substantial factor in the development of Grimshaw's mesothelioma.

Determining whether the evidence is legally sufficient to permit a finding of substantial factor causation is fact specific to each case. *Eagle–Picher v. Balbos,* 326 Md. 179, 210, 604 A.2d 445 (1992). In *Balbos* the Court of Appeals stated:

> The finding involves the interrelationship between the use of a defendant's product at the work-place and the activities of the plaintiff at the work-place. This requires understanding of the physical characteristics of the workplace and of the relationship between the activities of the direct users of the product and the bystander plaintiff. Within that context, the factors to be evaluated include the nature of the product, the frequency of its use, the proximity, in distance and in time, of a plaintiff to the use of a product, and the regularity of the exposure of that plaintiff to the use of that product. "In addition, trial courts must consider the evidence presented as to medical causation of the plaintiffs's particular disease."

*Id. (quoting Lockwood v. AC & S, Inc.* 109 Wash.2d 235, 744 P.2d 605, 613 (1987)). A plaintiff must show more than the presence of asbestos in the workplace; he must prove that he worked in the vicinity of the product's use. *Eckenrod v. GAF Corp.,* 375 Pa.Super. 187, 544 A.2d 50, 52–53 (1988). A plaintiff must present evidence "to show that he inhaled asbestos fibers shed by the specific manufacturer's product." *Id.* The relevant evidence is "the frequency of the use of the product and the regularity of the plaintiff's employment in proximity thereto." *Id.* This substantial factor causation test has come to be known as the "proximity, frequency and regularity" test.

Our review of the record indicates that there was sufficient evidence presented to establish Grimshaw's theory

and therefore, that the trial court properly submitted the issue to the jury.[11] It is undisputed that Grimshaw was employed at the Shipyard from 1940 to 1947 and from 1951 to 1979. The parties also agree that during the course of his employment, Grimshaw was exposed to asbestos-containing products and was diagnosed with mesothelioma in June 1994 and, as a result, died in January 1995. Grimshaw and his co-workers testified about the work environment and products with which they worked.

William Hahn, an apprentice, worked with Grimshaw, a machinist, for three to four months in 1947. In 1953 or 1954 when Grimshaw returned to the Shipyard, he and Hahn worked together as ratesetters and shared a double desk in the machine shop until 1969. As a ratesetter, Grimshaw spent half of his time in the office in the machine shop and half of his time on the ships. Hahn testified that when he was working as a ratesetter from 1955 to 1980, he worked around gasket products used by pipefitters or machinists. He also stated that the pipefitters would prepare the gaskets for installation in the shop where Grimshaw's office was. They would use a drill press converted into a gasket cutter and the dust would come into their office, which was a glass enclosed space with no ceiling.

Hahn also testified that one of the manufacturers or suppliers of the gaskets was Anchor. Anchor stipulated that its asbestos containing gaskets and packing products contained anywhere from sixty to eight-five percent asbestos fiber by weight. Finally, Dr. Gabrielson, a medical expert, testified that Grimshaw's work either with or around asbestos-containing gaskets and packing made by Anchor, throughout the

---

11. As long as plaintiff has presented some evidence to support his theory of liability, the trial court should submit the issue to the jury. Then, it is the duty of the jury, as trier of fact, to weigh the evidence and determine whether the plaintiff has proven by a preponderance of evidence that the plaintiff has mesothelioma, he worked in proximity to the defendant's product, and inhaled asbestos fibers from the product of a particular defendant. *See Armstrong II*, 326 Md. at 119, 604 A.2d 47.

entire time that he was at the Shipyard, was a substantial contributing factor in the development of Grimshaw's mesothelioma. In addition, Anchor's own expert, Dr. Stanley Fiel, testified under cross-examination that exposure to asbestos containing gaskets would contribute to the dose.

Grimshaw, therefore, did present evidence with regard to "the interrelationship between the use of a defendant's product at the work-place and the activities of the plaintiff at the work-place." *Balbos*, 326 Md. at 210, 604 A.2d 445. Grimshaw also presented evidence of the "nature of the product, the frequency of its use, the proximity, in distance and in time, of a plaintiff to the use of a product, and the regularity of the exposure of that plaintiff to the use of that product." *Id; see also Roehling v. National Gypsum Co. Gold Bond Bldg. Products*, 786 F.2d 1225, 1228 (4th Cir.Va.1986) ("The evidence, circumstantial as it may be, need only establish that [plaintiff] was in the same vicinity as witnesses who can identify the products causing the asbestos dust that all people in that area, not just the product handlers, inhaled."). Finally, Grimshaw provided the expert opinion of Dr. Gabrielson as to the "medical causation of the plaintiff's particular disease." *Balbos*, 326 Md. at 211, 604 A.2d 445. Accordingly, the trial court properly submitted the theory of Anchor's liability to the jury. It was then incumbent upon the jury to weigh the evidence and determine whether plaintiffs had proven by a preponderance of evidence that Anchor's products were a substantial factor in causing Grimshaw's mesothelioma, and the jury concluded that it was.[12]

## VIII

### ANCHOR'S DUTY TO WARN IN *GRIMSHAW*

▪▪▪ Appellant also argues that the trial court erred when it submitted the issue of Anchor's liability in *Grimshaw*

---

12. Appellants take several pages of their brief to raise contrary evidence to that presented by Grimshaw. These arguments, however, go to the weight and credibility of evidence examined by the jury, and not to whether there was sufficient evidence to present the issue to the jury.

to the jury when Grimshaw failed to produce evidence that Anchor knew or should have known that the gasket or packing products it sold were defective or unreasonably dangerous. A manufacturer or seller of an asbestos-containing product is liable in a failure or duty to warn case if it has "knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge, of the ... danger." *Owens–Illinois v. Zenobia*, 325 Md. 420, 437, 601 A.2d 633 (1992) (quoting Restatement (Second) of Torts § 402A, Comment *j* ). The "should have knowledge" component holds a manufacturer to the knowledge of an expert in the field. *Id.* (citing *Babylon v. Scruton*, 215 Md. 299, 304, 138 A.2d 375 (1958)).

▮ We are satisfied that Grimshaw presented sufficient evidence with regard to whether Anchor knew or should have known of the defective nature of its products to allow the issue of Anchor's liability to be presented to the jury. Grimshaw worked at the Shipyard from 1940 to 1947 and from 1951 to 1979. As discussed *supra*, part VII, Grimshaw worked in the machine shop where Anchor gaskets were being cut.

At trial, Anchor's former New England district manager, John D. Call, testified that, prior to 1975, no warnings accompanied Anchor asbestos-containing products. He also testified concerning a letter dated November 19, 1975 from the vice president and general sales manager of Garlock Packing Company, A.W. Miedema. The letter stated that Raybestos–Manhattan would be including a card with its shipments to Anchor regarding the hazards of asbestos dust and instructed the district managers to remove the cards. On February 2, 1976, Miedema sent another letter stating that another card would be issued without the Raybestos–Manhattan name, regarding the hazards of asbestos dust and that those cards should accompany the shipment of asbestos products. Call testified that it was possible that during this activity there was a period of time when no warnings were put into the asbestos products shipments. Call also testified that, to his knowledge, from 1905 when Anchor first sold asbestos-containing gaskets and packing until the time when Call retired in 1993, no tests

or studies were ever performed by Anchor to determine how much dust was created by the use of its gaskets or packing.

Anchor's claim that it was unaware of the hazards of asbestos containing products prior to 1975 was not consistent with diligence or inspection of its gaskets or packing. Several experts testified on the history of asbestos and the evolving awareness of asbestos disease. Dr. Castleman testified as an expert that there was an awareness that asbestos products could cause asbestos-related disease or cancer in 1930. He also testified that there were several articles published in the 1940's, '50's, and '60's about asbestos, asbestosis, lung cancer, and mesothelioma in persons exposed to asbestos insulation products. Dr. Castleman testified that, from a public health standpoint, by the late 1930's, it was known from the published and widely available medical and scientific literature that persons exposed to dust released from asbestos insulation products were at risk for developing the disease asbestosis.

Dr. Dement, called by plaintiff as an expert, testified that gaskets and packing were listed by Dr. Merewether in a 1930 report as products that contained asbestos. Contrary to Anchor's argument, OSHA did not exempt gaskets and packing from regulations requiring warning labels. Rather, Dr. Dement testified that, when OSHA issued its initial warning requirements with regard to asbestos-products, it provided an exemption for materials that "in some way the fiber is encapsulated, locked into a product ... under the anticipated use, even if it is locked in, if you saw it with a saw and the stuff flies out and you are exposed, then you have to label it."

A jury could reasonably conclude, given the above testimony on the awareness in the industry concerning the hazards of asbestos containing products, that Anchor knew of the hazardous effects of asbestos and failed to include warnings in its shipments. There was sufficient evidence to present Grimshaw's theory of liability to the jury; therefore, we find no error by the trial court.

## IX

## OC'S MOTION FOR JUDGMENT IN *GRANSKI*

Appellant OC contends that the trial court erred in refusing to grant its motion for judgment on Granski's negligence and strict liability claims. OC contends that it is not liable for Granski's household exposure to asbestos fibers because Granski's injuries were not foreseeable and, therefore, it owed her no duty to warn. In addition, OC contends that its product was not a substantial contributing factor to Granski's illness. In determining whether to grant a motion for judgment, the trial court considers "all evidence and inferences in the light most favorable to the party against whom the motion is made." MD. RULE 3–519(b). The trial court ultimately must determine based on the evidence, if accepted as true, whether the jury could reasonably find in favor of the plaintiff. *Hartford Accident & Indem. Co. v. Sherwood Brands, Inc.*, 111 Md.App. 94, 121, 680 A.2d 554 (1996), *cert granted*, 344 Md. 116, 685 A.2d 450 (1996).

## A

Granski's claimed exposure to OC's product is from exposure to asbestos dust on her stepfather's clothes brought into the home from the workplace. There have been no appellate cases in Maryland that have specifically called upon us or the Court of Appeals to decide whether a manufacturer has a duty to warn of the dangers of household exposure to asbestos. Our case law, however, makes clear that manufacturers have a duty to warn all individuals in the foreseeable zone of danger. *Moran v. Faberge*, 273 Md. 538, 332 A.2d 11 (1975). We hold that the dangers Granski suffered as a result of her exposure to OC's product were not unforeseeable as a matter of law, and thus the trial court properly denied appellants' motion for judgment. Whether it was foreseeable to OC that asbestos workers would bring home asbestos-covered clothes and expose their households to harm is an issue to be determined by the jury.

██ The Restatement (Second) of Torts § 388 (1965) has been cited in Maryland cases as the general principle of a manufacturer's duty to warn. *See Twombley v. Fuller Brush Co.*, 221 Md. 476, 158 A.2d 110 (1960); *Katz v. Arundel–Brooks Concrete Corp.*, 220 Md. 200, 151 A.2d 731 (1959). Section 388 provides, in part, that a supplier of a product is subject to liability to "those whom the supplier should expect to use the chattel ... or be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied." In *Moran*, the Court of Appeals stated that § 388 can be misleading. *Moran*, 273 Md. at 544, 332 A.2d 11. "[T]he duty of the manufacturer to warn of latent dangers inherent in its product goes beyond the precise use contemplated by the producer and extends to all those which are reasonably foreseeable." *Id.* at 545, 332 A.2d 11 (citing *Spruill v. Boyle–Midway, Inc.*, 308 F.2d 79, 83–84 (4th Cir.Va. 1962)). Comment *k* to § 395 explains that a foreseeable use is one that a manufacturer may reasonably anticipate even though it is a use other than one for which the product is primarily intended. For example, "the maker of a chair ... may reasonably expect that some one will stand on it." *Id.*

██ The Court of Appeals, in *Segerman v. Jones*, 256 Md. 109, 132, 259 A.2d 794 (1969), set forth the test of foreseeability, as stated in *McLeod v. Grant County School Dist.*, 42 Wash.2d 316, 255 P.2d 360 (1953). The Court explained that

> the pertinent inquiry is not whether the actual harm was of a particular kind which was expectable. Rather, the question is whether the actual harm fell within a general field of danger which should have been anticipated.

*Id.* "It is not necessary that the defendant should have had notice of the particular method in which an accident would occur, if the possibility of an accident was clear to the ordinarily prudent eye." *Moran*, 273 Md. at 552, 332 A.2d 11 (citing *Palsgraf v. Long Island R. Co.*, 248 N.Y. 339, 162 N.E. 99 (N.Y.1928)). Consequently, "it is not necessary that the

manufacturer foresee the exact manner in which accidents occur." *Id.* at 553, 332 A.2d 11.

In *Moran,* the plaintiff sat near a friend who poured Faberge cologne on a burning candle, causing a burst of fire to flare out and burn plaintiff. Plaintiff established that the cologne was highly flammable and thus, inherently dangerous, but that no warning was given. *Id.* at 540–41, 332 A.2d 11. The Court opined that

> it was only necessary that the evidence be sufficient to support the conclusion that Faberge, knowing or deemed to know that its Tigress cologne was a potentially dangerous flammable product, could reasonably foresee that in the environment of its use, such as the home of the Grigsbys, this cologne might come close enough to a flame to cause an explosion of sufficient intensity to burn property or injure bystanders, such as [plaintiff].

*Id.* at 554, 332 A.2d 11. The Court held that the evidence was legally sufficient to enable a jury to find that Faberge's failure to place a warning on its cologne constituted actionable negligence for plaintiff, even though plaintiff was not the purchaser or user of the product. *Id.* Similarly, in the case before us, the evidence supported the conclusion that OC could reasonably expect that workers would bring home work clothes covered in asbestos dust and thereby expose their families to harm. This is so because OC knew or should have known that its asbestos-containing insulation product, Kaylo, was a hazardous product. Thus, OC could reasonably foresee that the use of its product, which results in asbestos dust becoming airborne and soiling insulators' clothes, may result in workers wearing their asbestos-covered clothes home and exposing their households to harms associated with asbestos dust. It is not necessary that OC foresee the exact manner in which harm could occur, e.g., that a Kaylo insulator's family member might be exposed to hazardous asbestos fibers when washing the worker's clothing. *Id.*

The evidence presented, if believed, established that Granski's stepfather worked with the asbestos-containing insulation

product manufactured by OC, under the trade name of Kaylo, between 1955 and 1961. Granski lived with her stepfather between 1953 and 1963 and was responsible for washing his work clothes. Granski testified that her stepfather's clothes were very dirty and covered in a whitish-gray dust. Articles were introduced to prove that OC knew or should have known of the hazards of airborne asbestos fibers released from Kaylo insulation. The fact that the ultimate harm suffered was not foreseeable does not preclude liability. *Eagle–Picher*, 326 Md. at 197, 604 A.2d 445.

Moreover, Dr. Dement testified as an expert that known in the industry since 1930 is the fact that it is important for workers not to bring toxic substances home on their clothing and thereby expose their families to it. Dr. Dement stated that workers need to know that their clothes can become contaminated and expose their families. Asbestos fibers do not biodegrade and could cause continuous exposure of asbestos. Finally, Dr. Mark concluded that Granski's exposure to asbestos from her stepfather's work clothes caused her malignant mesothelioma. A jury, therefore, could reasonably conclude that Granski's injuries were foreseeable and that OC had a duty to warn of household exposure.

Appellant, however, argues that even if OC had a duty to warn Granski, OC's failure to warn was not the proximate cause of her illness. In Maryland, the Court of Appeals recognizes a presumption that persons exercise ordinary care for their own safety. *Balbos*, 326 Md. at 228, 604 A.2d 445. "The Maryland 'presumption' at a minimum means that jurors are entitled to bring to their deliberations their knowledge of the 'natural instinct' and 'disposition' of persons to guard themselves against danger." *Id.* at 229, 604 A.2d 445. In cases in which defendants have argued that plaintiff would not have heeded a warning, if given, the argument was based on evidence of the specific plaintiff who was injured. *Id.* (citing *Raney v. Owens–Illinois, Inc.*, 897 F.2d 94 (2d Cir.N.Y.1990) and *Skonberg v. Owens–Corning Fiberglas Corp.*, 215 Ill.App.3d 735, 159 Ill.Dec. 359, 576 N.E.2d 28 (1st

Dist.1991)). Moreover, even in those cases in which the argument was presented, defendants were unsuccessful. *Id.* In this case, OC has presented no evidence that Granski or her stepfather's personalities were such that they would not have heeded proper warnings if given.

The trial court also properly denied appellant's motion for judgment as a matter of law under strict liability. Maryland adopted the principles of strict liability set out in the RESTATEMENT (SECOND) OF TORTS § 402A in *Phipps v. General Motors Corp.*, 278 Md. 337, 363 A.2d 955 (1976). Section 402A provides that a seller of a product may be liable to the user or consumer of its product if sold in a defective condition unreasonably dangerous. The failure to warn or insufficiency of a warning is considered a defective condition of a product. *Balbos,* 326 Md. 179, 604 A.2d 445. In *Valk Manufacturing Co. v. Rangaswamy,* 74 Md.App. 304, 317, 537 A.2d 622 (1988), *rev'd on other ground,* 317 Md. 185, 562 A.2d 1246 (1989), we held that bystanders may recover under strict liability when the injuries they suffer are reasonably foreseeable. As discussed *supra,* based on the evidence, a jury could conclude that Granski's injuries were foreseeable. Thus, the trial court properly denied the motion for judgment as a matter of law on strict liability, and the issue of whether OC had a duty to warn of the hazards of household exposure was properly submitted to the jury.

Appellant relies on *Rohrbaugh v. Owens–Corning Fiberglas Corp.*, 965 F.2d 844 (1992) in which the court, applying Oklahoma law, held that OC did not have a duty to warn the wife of an insulator who worked with asbestos, because she was not a foreseeable user of the product. That case, based on Oklahoma tort law principles, is not relevant to our analysis under Maryland law. In *Rohrbaugh,* the court observed that Oklahoma law requires that manufacturers have a duty to warn consumers of potential hazards, but that duty extends only to the ordinary consumers and users of the product. *Id.* at 846. The court then determined that the wife of an

insulator was not a foreseeable user of the asbestos containing product. *Id.*

By contrast, under Maryland law, the manufacturer has a duty to warn persons in the foreseeable zone of danger. *See Moran*, 273 Md. at 545, 332 A.2d 11; *see also Balbos*, 326 Md. 179, 604 A.2d 445 (Court recognized that manufacturers of asbestos-containing products have a duty to warn bystanders). In addition, the court in *Rohrbaugh* concluded that the plaintiffs had not produced any evidence that the defendant knew or should have known of the hazards associated with its product.. *Id.* at 847. In the instant case, Granski presented evidence that OC knew or should have known of the potential danger of asbestos exposure.

## B

Appellant OC also argues that the trial court should have granted its motion for judgment because the evidence introduced at trial was insufficient to establish that OC's Kaylo was a substantial factor in causing Granski's illness. Specifically, appellant contends that it was not established that Abrams worked at the Shipyard when OC manufactured or distributed asbestos containing products. The trial court did not abuse its discretion in denying appellant's motion for judgment based on substantial factor causation, because there was sufficient evidence presented at trial from which a jury could reasonably conclude that Abrams worked as an insulator at the Shipyard where Kaylo was used. Viewing the evidence in the light most favorable to the non-moving party, the jury could also reasonably conclude that the asbestos dust from OC's product was carried into his household on his clothes, thereby causing his stepdaughter, Granski, to inhale the fibers in their household and later develop mesothelioma.

In order to establish that OC's Kaylo was a substantial factor in causing Granski's illness we look to the "frequency, proximity and regularity" test set forth in *Balbos*. *Id.* at 210, 604 A.2d 445. Abrams testified that he married Granski's mother, Rose, in 1953 and lived with Granski and the rest of

the family from 1953 until 1963. During Abrams's marriage to Rose, he was employed by five different employers. From 1955 until 1966, he was employed by C & O Railroad as a brakeman. Abrams explained that during this period he was frequently furloughed and would work at the Newport News Shipbuilding and Drydock. The furloughs would last at least fifty-nine days. Although the Shipyard and the social security administration have no record of Abrams working at the Shipyard between 1955 and 1960, Abrams testified that he worked at the Shipyard during this time period on U.S. navy vessels, *Enterprise* and *Ranger*, as an insulator, covering pipes, and mixing mortar and asbestos. Granski corroborated Abrams's testimony when she recalled that her stepfather worked at the C & O Railroad as a brakeman and "whenever there was a low or layoff or whatever, he would go to work at the shipyard."

Abrams was unable to recall the names of the products or people that he worked with aboard the ship forty years ago. Other witnesses who worked on the same vessels, however, testified that OC Kaylo was used and stored extensively on the *Ranger* and *Enterprise*. Charles Lea, who worked on the *Ranger* as an insulator, between 1953 and 1968, testified that Kaylo was stored and used on that ship during construction. In addition, Arthur Burris worked at the Shipyard between 1955 and 1971 in various positions, including foreman and insulator. Burris also testified that Kaylo was used and stored extensively on both ships during construction. Abrams averred that he would bring home his work clothes and that Granski was responsible for washing them. Abrams testified that Granski would "pick them up, shake them, throw them in the washing machine." Granski remembered that her stepfather's work clothing was "very dirty" and the dust on them was "whitish-gray."

Dr. Dement testified that when asbestos is released in the household, it presents a "continuing exposure" because it is not biodegradable and continues to become airborne. In Dr. Mark's expert opinion, Granski's exposures to asbestos from her stepfather's work clothes caused her malignant mesotheli-

oma. Therefore, in accordance with the guidelines set forth in *Balbos*, Granski presented sufficient evidence from which a jury could reasonably conclude that OC's Kaylo was a substantial factor in causing her injury.

## X

### OC'S MOTION FOR JUDGMENT IN *ZUMAS*

OC also argues that the trial court erred in not granting its motion for judgment in the Zumas case, or in the alternative, in granting plaintiffs' motion for judgment notwithstanding the verdict with respect to the jury's liability findings against GAF, Owens–Illinois, and Rapid–American. In reviewing the trial judge's rulings on these motions, we look at the evidence and all reasonable inferences which can be drawn from it in the light most favorable to the non-moving party. *Hartford*, 111 Md.App. at 121, 680 A.2d 554.

At the close of evidence, OC moved for judgment in *Zumas* on the basis of lack of substantial factor causation. The court denied the motion, and the jury found that the plaintiff had proven by a preponderance of evidence that Nick Zumas's exposure to OC's asbestos-containing product was a substantial contributing factor in the development of his mesothelioma. With regard to OC's cross and third-party claims, the jury concluded that OC had proven by a preponderance of evidence that Nick Zumas's exposure to the products manufactured by AWI, ACandS, GAF, Hopeman, O–I, PCC, Rapid, and Westinghouse was a substantial factor in causing Zumas's injury.

Thereafter, the court granted plaintiff's motion for judgment notwithstanding the verdicts regarding GAF, O–I, Rapid, and Westinghouse. Appellant argues that the evidence adduced at trial against the cross-defendants by OC was "qualitatively similar" to the evidence produced by plaintiffs against OC. Thus, argues appellant, the trial court should either have granted its motion for judgment or denied plaintiffs' motion for judgment notwithstanding the verdict.

■ We first examine the legal sufficiency of the evidence with regard to OC's motion for judgment. Viewing the evidence in the light most favorable to plaintiffs, the non-moving party, the testimony of Zumas and his co-worker established that Zumas had "regular, frequent and proximate" exposure to OC's asbestos containing Kaylo product. *See Balbos,* 326 Md. at 210, 604 A.2d 445; *see supra,* question VII. The evidence established that OC distributed Kaylo products from 1953 to 1973, and it manufactured Kaylo from 1958 to 1972. O–I manufactured Kaylo products from 1948 to 1958.

Zumas worked at the Shipyard from 1955 to 1987 as a machinist. Zumas testified that he worked in every department where there was a machine, including the engine room and boiler room on the boat. He spent fifteen percent to twenty percent of his time on the ship. Zumas described that the engine and boiler room on the ship "looked like [a] snowstorm most [of] the times. You know dust and all kind of stuff flying all over the place." Zumas further described how the dust would come up onto the deck. Zumas recalled that some of the insulation he saw was manufactured by Johns–Manville and Armstrong. Zumas spent the rest of his time in the shops on the crane repairing brake shoes and broken gears. These shops were located all over the Shipyard.

Zumas's co-worker, Donald Byrnes, also testified. Byrnes worked at the Shipyard from 1956 to 1989 and knew Zumas "very well." Byrnes was an electrician, and like Zumas, he worked in the various shops. Byrnes testified that he saw Zumas on a daily basis in the machine shops or on board the ships. Byrnes recalled that there were thirty to forty insulators on each of the ships who used products containing asbestos. The products were pipe covering and blocks of asbestos which were applied to the boiler rooms. There also was a compound of asbestos that would be mixed with water and used as a mud to cover pipes. Byrnes testified that one of the manufacturers of the pipe covering was Kaylo and another was Unibestos by Manville. He also remembered that the mud compound was manufactured by Armstrong and Manville.

Byrnes testified that he saw Zumas in the area in which the insulators were working and Kaylo dust was in the air. According to Byrnes, Kaylo was used at the Shipyard for the first time in the early 1960's and through the early 1970's. Byrnes stated that Kaylo was also present in the shops to insulate steam pipes, and it would produce dust in the air when applied. There were very few times when Byrnes saw Zumas that he was not in a cloud of Kaylo dust. "Almost all the shops had all types [of] asbestos pipe covering and God knows how old the shipyard is and a lot of that was frayed and damaged and the buildings had a tendency to vibrate which created dust constantly. You could see it, you know, through the sunlight or lights, ceiling lights."

The evidence establishes the proximity, frequency, and regularity of Zumas's exposure to the asbestos products of OC in the ships and at the shops. A jury could reasonably conclude that OC's product was a substantial factor in causing Zumas's mesothelioma, and thus, the trial court properly denied OC's motion for judgment.

■■■ The evidence produced by OC with regard to its cross-claims against third-party defendants, however, did not establish that Zumas was frequently and regularly exposed to the cross-defendants' products, or that Zumas worked in proximity to their products. In *Balbos,* the Court stated that "a plaintiff must establish more than the presence of asbestos in the workplace; he must prove that he worked in the vicinity of the product's use." *Balbos,* 326 Md. at 211–212, 604 A.2d 445 (citing *Eckenrod v. GAF Corp.,* 375 Pa.Super. 187, 544 A.2d 50, 52–53 (1988)). In the instant case, viewing the facts in the light most favorable to third-party plaintiff, OC, the evidence establishes only that GAF, Rapid, Westinghouse, and O–I products were generally used in the vast Shipyard.

William Hahn worked at the Shipyard and recalled that, when he worked on board the ship, from 1941 to 1943 and from 1946 to 1950, the pipe covering he saw was manufactured by GAF Ruberoid, Armstrong, Kaylo, Pabco, Manville, and Unibestos. Hahn worked as a flanger machinist in the flange

mill across the street from the Shipyard from 1950 to 1955. Then, he went back to the Shipyard in the incentive and methods department as a ratesetter from 1955 until 1980. During that time, Hahn testified, he saw the same brand name asbestos products being used on the ships.

Thus, OC established that the products of the cross-defendants were "generally" found in the vast Shipyard and on board on the ships. OC did not establish that Zumas was in the same vicinity as these products. Therefore, OC could not establish the regularity, frequency, and proximity of Zumas to the cross-defendant's products. *Id.* at 212, 604 A.2d 445. To the contrary, plaintiffs established, through the testimony of Byrnes, that OC Kaylo was on the ships and in the shops from the early 1960's and that Byrnes saw Zumas working with and around OC's product, in a cloud of dust, on a daily basis over a period of many years. It was also established that during that time period OC was the manufacturer of Kaylo.[13] According to *Balbos,* therefore, OC did not establish that the cross-defendant's products were a substantial factor in causing Zumas's mesothelioma. The trial court did not abuse its discretion in granting Zumas's motion for judgment in favor of the cross-defendants notwithstanding the verdict. *B & K Rentals & Sales Co., Inc. v. Universal Leaf Tobacco Co.,* 73 Md.App. 530, 535 A.2d 492 (1988), *rev'd on other grounds,* 319 Md. 127, 571 A.2d 1213, *aff'd,* 84 Md.App. 103, 578 A.2d 274 (1990), *rev'd on other grounds,* 324 Md. 147, 596 A.2d 640 (1991).

## XI

### HOPEMAN'S MOTIONS IN *ZUMAS*

Before trial, Hopeman settled all claims with Zumas's estate for a pro tanto release. OC had a cross-claim for contribution

---

**13.** Owens-Illinois manufactured Kaylo from 1948 to 1958. Byrnes testified that he saw Kaylo products in the early 1960's, and thus, his testimony does not establish Zumas's exposure to Owens–Illinois Kaylo product.

against Hopeman that was pursued to verdict. The jury found Hopeman liable for contribution to OC. Hopeman moved for judgment at the close of cross-plaintiff OC's case, and at the close of all the evidence. Hopeman also filed a motion for judgment notwithstanding the verdict. All motions were denied. Hopeman argues that OC's evidence against it was legally insufficient to satisfy the requirements of substantial factor causation. Viewing the evidence and any reasonable inferences in a light most favorable to the non-moving party, OC, we must determine whether a jury could reasonably conclude from the evidence that OC is entitled to recover from Hopeman. *Collier v. Eagle–Picher Industries, Inc.*, 86 Md.App. 38, 585 A.2d 256 (1991); *see also James v. General Motors Corp.*, 74 Md.App. 479, 538 A.2d 782 (1988) (appellate review of a trial court's grant or denial of a motion for judgment requires the same standard of evidentiary analysis as the trial court).

■■■ In order to establish substantial factor causation, plaintiff must present evidence to explain the proximity, frequency, and regularity of exposure to the product. *Balbos*, 326 Md. at 210–11, 604 A.2d 445; *see supra*, question VII. Hopeman designed, built, and outfitted the quarters on ships during some years pertinent to Zumas's employment at the Shipyard. Hopeman was under contract with the Shipyard beginning in the middle to late 1930's until 1956, and again in 1965 until 1980. Therefore, between 1956 and 1965, Hopeman did not work at the Shipyard. Zumas was employed as a machinist at the Shipyard from 1955 until 1987.

Ships at the Shipyard were built in the "ways," and then launched to the wet docks for final construction. Hopeman performed its activities on ships in the wet docks only. In addition to constructing furniture and cabinets and assembling galley equipment, Hopeman constructed joiner bulkheads (walls) and ceilings, using certain asbestos-containing panels and steel. Hopeman was not the manufacturer of the panels. Over twenty percent of Hopeman's total man hours were spent placing, cutting, and fitting the panels. In 1965, Hope-

man implemented a program to control dust generated during panel cutting, which it believed was dangerous to the lungs. Hopeman equipped all saws used to cut panels with a vacuum attachment designed to capture dust. Hopeman also tried to isolate dust by transferring the cutting of panels to a warehouse off the vessel.

Consequently, in order for a jury to conclude that Hopeman was a substantial factor in causing Zumas's mesothelioma, there must be some evidence that Zumas worked in proximity to the places in which Hopeman was cutting the asbestos-containing panels. As observed, *supra,* Hopeman originally would cut the paneling on the ships in the wet dock and later, sometime after 1967, began cutting most of the panels in a warehouse set up exclusively for the purpose of cutting paneling. At trial, Zumas testified that he worked in every department in which there was a machine, including the engine room and boiler room on the ship. He spent fifteen percent to twenty percent of his time on the ship. Zumas described the engine and boiler room on the ship as looking "like [a] snowstorm most [of] the times. You know dust and all kind of stuff flying all over the place." Zumas recalled that some of the insulation he saw was manufactured by Johns–Manville and Armstrong. Zumas also worked in the shops on the cranes repairing brake shoes and broken gears.

Donald Byrnes, Zumas's co-worker, testified that, although Zumas worked primarily in the shops, he would be sent to other places to do repair work because of his trade. Byrnes stated that he remembered seeing Hopeman working in the warehouse and on the ships. In the warehouse they would be "cutting paneling and things of that nature." Byrnes testified that they would be doing similar things on the ships. Byrnes was then questioned as follows:

Q. Now, were you ever around Mr. Zumas while he was in the presence of Hopeman Brothers while they were working?

A. Yes.

Q. And would that be in the warehouse or the ship?

A. Mostly in the warehouse.

Q. And what would Mr. Zumas be doing while they were working?

A. Well, we had a—they had a small overhead crane, and he might be working on a crane, thought it was an electrical problem or it could have been an electrical problem or maybe a wheel or something loose or a bearing bad. He would go up, also, like on a blower fan, put new belts on, the same with the saws. He would probably put a new belt on and maybe lubricate or grease them.

Later, Byrnes further explained his testimony as follows:

Q. Okay. Now, as a millwright, Mr. Zumas didn't fix electrical equipment, did he? He didn't do electrical repair, did he?

A. It wasn't part of his job description, no.

Q. That was something you did?

A. That is right.

Q. ... Now Mr. Zumas didn't repair—you indicated that he didn't repair hand-held equipment; is that correct?

A. That is correct.

Q. So, he wouldn't have repaired a circular saw like the one that Mr. Candon showed you this morning?

A. No, that was done in number 7 toolroom.

Q. ... I believe it was your testimony that Mr. Zumas was in—had occasion to be in Hopeman's warehouse fixing an exhaust fan. Was that your testimony?

A. Yes.

Q. ... He would have to go and adjust the belt or replace the belt?

A. Uh-huh.

Q. Would that type of activity take more than an hour, sir?

A. No.

Byrnes's testimony, other evidence, and reasonable inferences drawn therefrom, viewed in the light most favorable to OC, establishes that Zumas worked for an hour on at least one occasion in the warehouse in which Hopeman cut paneling and asbestos dust was airborne. Byrnes's testimony addresses Zumas's proximity to Hopeman, but does not establish the frequency or regularity factors set out in *Balbos*. There is no other evidence that establishes Zumas's exposure to Hopeman in the warehouse.

As far as Zumas's exposure to Hopeman's cutting of panels on board ships in the wet dock area, there is no direct evidence that Zumas worked in proximity, regularity, or frequency to Hopeman's operations. Zumas testified that he would pass through the quarters to get to his work area, but he did not work inside the quarters.

The witnesses who testified established that Hopeman would cut asbestos-containing panels, thereby creating dust, but their testimony did not establish that Zumas was in the proximity of Hopeman on the ships or even on the same ships on which Hopeman was working. Byrnes did not specify the ships on which Zumas worked or whether they were in the wet docks on which Hopeman worked. Grimshaw testified that he had experience working around Hopeman in 1940 and 1943. That time period, however, was before Zumas was working at the Shipyard. William James also testified that he was a pipefitter at the Shipyard in 1957 until 1987. James recalled that Hopeman created dust when it cut and installed paneling in the deckhouse. According to James, other trades, such as machinists, sheet metal workers, and pipefitters would be in the area when this occurred. McCaffery testified in his case that he worked as a sheet metal worker between 1968 and 1970. He remembers that Hopeman was at the Shipyard during that time, but could not recall whether Hopeman was cutting in an isolated area or using vacuums. There was also no evidence that McCaffery and Zumas were on the same ship. Balonis also testified in his own case and stated that he worked for Hopeman in 1947 and 1948, ten years before

Zumas began working at the Shipyard. His testimony provides no link between Hopeman and Zumas.

In addition, the instant case is distinguishable from the cases relied on by OC to support its assertion that circumstantial evidence in the instant case establishes that Hopeman was a substantial factor in causing Zumas's illness. In *Owens–Corning Fiberglas v. Garrett*, 343 Md. 500, 682 A.2d 1143 (1996), the Court concluded that the evidence was legally sufficient under the "frequency, regularity and proximity" test to present the issue to the jury of whether O–I Kaylo was a substantial factor in causing William Hohman's mesothelioma. In *Garrett*, Hohman died prior to trial and, therefore, was unable to testify. *Id.* Instead, co-workers testified that Kaylo was used at the Conoco facility during the period of time when Hohman was employed. *Id.* at 528, 682 A.2d 1143. One of Hohman's co-workers testified that Hohman was in the boiler house at Continental in the 1950's and 1960's and was around when the dust was generated from the pipe-covering. He further stated that "Hohman was there on every job that was even done at Continental Oil ... he had to be on every job in that boiler room." *Id.* at 529, 682 A.2d 1143. Finally, a doctor testified that the cause of Hohman's death was from asbestos. *Id.*

Appellee OC also relies on *ACandS, Inc. v. Godwin*, 340 Md. 334, 667 A.2d 116 (1995). In *ACandS*, the evidence showed that one of the plaintiffs worked for over twenty years outside the building where asbestos was continually being removed and reapplied to the furnaces. In addition, that plaintiff was required to enter the building five to six times a day. *Id.* at 352, 667 A.2d 116. Another injured worker in the case did pipe covering work for twelve to fourteen months. *Id.* at 355, 667 A.2d 116. It was also established that one of the pipe covering products used at that time was Unibestos. *Id.* Other plaintiffs worked on a blast furnace for a shift of twelve hours in a twenty-four hour period, seven days a week for six consecutive weeks. *Id.* at 356, 667 A.2d 116. The Court held in all these cases that the evidence established the "frequency,

regularity, and proximity" of the plaintiffs' exposure to the asbestos-containing product.

In the case at bar, however, there is no evidence that Zumas worked in the same area as Hopeman except in the warehouse, and that was for at most an hour. In *Balbos*, the Court recognized that the size of the workplace is also a factor to be considered. *Id.* at 211, 604 A.2d 445. In *Balbos*, the Court stated that "a plaintiff must establish more than the presence of asbestos in the workplace; he must prove that he worked in the vicinity of the product's use." *Id.* Similarly, in *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156 (4th Cir.Md. 1986), the court stated:

> [W]hen one considers the size of a workplace such as Key Highway Shipyard, the mere proof that the plaintiff and a certain asbestos product are at the same shipyard at the same time, without more, does not prove exposure to that product.

As stated in *Balbos*, there must be an understanding of the workplace. In the instant case, we have learned that the workplace was a Shipyard with several different unattached work areas and several construction areas for different ships and for different stages of ship construction. The facts, unlike the facts in *Garrett* or *ACandS*, do not establish Zumas's proximity, frequency, or regularity of exposure.

**JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED IN PART AND REVERSED IN PART; JUDGMENT AGAINST HOPEMAN BROTHERS IS REVERSED; CASE REMANDED FOR THE ENTRY OF JUDGMENTS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID ONE–HALF BY APPELLANTS AND ONE–HALF BY APPELLEES.**